STATE FOR USE OF NATIONAL SURETY CORP. *v.*
MALVANEY, et al.

May 10, 1954

No. 39172 64 Adv. S. 56 72 So. 2d 424

*Young & Daniel,* Jackson; *Witherspoon & Bordeaux,* Meridian, for appellant.

194

*Creekmore & Beacham,* Jackson, for appellee E. L. Malvaney.

*Snow & Covington,* Meridian; *L. L. Forman,* Meadville, for appellees W. E. Boggan and United States Fidelity and Guaranty Company.

HOLMES, J.

The appellant brought this suit originally in the Chancery Court of the First Judicial District of Hinds County, as an attachment in chancery, against W. E. Boggan, Superintendent of Education of Franklin County, United States Fidelity and Guaranty Company, the surety on the said Boggan's official bond, Bank of Franklin, a banking corporation domiciled at Meadville in Franklin County, Mississippi, E. L. Malvaney, a resident of the

First Judicial District of Hinds County, and certain other parties who were named as defendants for the purpose of binding in their hands any funds or effects owing or belonging to the United States Fidelity and Guaranty Company, but who were discharged by agreement of counsel upon the filing of an appropriate bond' by the United States Fidelity and Guaranty Company in the penalty of $10,000.

The suit sought recovery of the sum of $11,000 upon the ground that retainage funds in that amount had been negligently released to the contractor under a construction contract, thereby depriving appellant of resort thereto under the equitable doctrine of subrogation.

On motion of the defendant W. E. Boggan, the cause was transferred to the Chancery Court of Franklin County where it was finally heard and decided on its merits and a final decree rendered therein dismissing the original bill as to the defendants W. E. Boggan, United States Fidelity and Guaranty Company, and Bank of Franklin, and awarding a money decree in the sum of $5,500 in favor of the complainant, National Surety Corporation, and against the defendant E. L. Malvaney. From the final decree entered, the National Surety Corporation and the said E. L. Malvaney each prosecuted an appeal to this Court. There was no appeal as against the decree in favor of the Bank of Franklin.

The litigation arose out of the following facts and circumstances: Shortly prior to October 12, 1950, the Board of Trustees of the Meadville Consolidated School District entered into a verbal agreement with the appellee, E. L. Malvaney, whereby the said Board of Trustees employed the said Malvaney as an architect to prepare plans and specifications for and to supervise the construction of an auditorium and cafeteria building in Meadville, Franklin County, Mississippi. The compensation of the architect was fixed at six per cent of the contract price. On October 12, 1950, the said Board of Trustees entered into a written contract with L.

Chester Owens as contractor to construct the aforesaid building for the total contract price of $93,577.00, in accordance with the plans and specifications prepared by the said architect and adopted by the said board of Trustees. Among other provisions of the contract were the following:

"Article 4. Progress Payments — The owner shall make payments on account of the Contract as provided therein, as follows: On or about the 5th day of each month 85 per cent of the value, based on the Contract prices, of labor and materials incorporated in the work and of materials suitably stored at the site thereof up to the 1st day of that month, as estimated by the Architect, less the aggregate of previous payments; and upon substantial completion of the entire work, a sum sufficient to increase the total payments to ............ per cent of the Contract price ....................... (Insert here any provision made for limiting or reducing the amount retained after the work reaches a certain stage of completion.)

"Article 5. Acceptance and Final Payment — Final payment shall be due 30 days after substantial completion of the work provided the work be then fully completed and the contract fully performed. Upon receipt of written notice that the work is ready for final inspection and acceptance, the Architect shall promptly make such inspection, and when he finds the work acceptable under the Contract and the Contract fully performed he shall promptly issue a final certificate, over his own signature, stating that the work provided for in this Contract has been completed and is accepted by him under the terms and conditions thereof, and that the entire balance found to be due the Contractor, and noted in said final certificate, is due and payable.

"Before issuance of final certificate the Contractor shall submit evidence satisfactory to the Architect that all payrolls, material bills, and other indebtedness connected with the work have been paid.

"If after the work has been substantially completed, full completion thereof is materially delayed through no fault of the Contractor, and the Architect so certifies, the Owner shall, upon certificate of the Architect, and without terminating the Contract, make payment of the balance due for that portion of the work fully completed and accepted. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims."

On October 16, 1950, the said Owens executed a performance bond on which the appellant, National Surety Corporation, became surety. As the construction progressed, and on periodic estimates approved by the architect, progress payments were made to the contractor, which by May 28, 1951, amounted to the total sum of $78,209.62. On July 2, 1951, the architect wrote a letter to the board of trustees advising that an inspection of the auditorium and cafeteria building indicated substantial completion of the contract with certain exceptions therein stated, and recommended the acceptance of the building with the exceptions stated. This letter, signed by the architect, was as follows:

"Board of Trustees

"Meadville Schools

"Meadville, Mississippi

"Gentlemen:

"An inspection of the auditorium and cafeteria building indicates substantial completion of the contract with the following exceptions:

1. Clear building, wash windows, remove debris.
2. Flag halyard too short.
3. Complete hanging of a few doors and install hardware.
4. Complete electric fixtures in cafeteria and connect heaters in auditorium.
5. Credit due owner for cabinets omitted, hardware for same and fibertile ceiling omitted over stage.

This office recommends the acceptance of the building with the exception of the above mentioned items."

On July 6, 1951, the contractor presented to the architect his estimate No. 8, which was approved by the architect, and was as follows:

"MEADVILLE AUDITORIUM & GYMNASIUM
Estimate No. 8
July 6, 1951

| | |
|---|---|
| "Contract Price | $93,557.00 |
| "Previous Payments | 78,209.62 |
| | |
| "Balance due on Contract | $15,347.38 |
| "Amount due this Estimate | 1,544.09 |
| "Partial Payment on Retainage | 11,000.00 |
| | |
| "Total due | $12,544.09 |

"This will leave a balance due on contract of $2,803.29.
L. Chester Owens

"APPROVED:
E. L. Malvaney
DATE: 7/6/51"

On that same date the architect addressed a letter to the Board of Trustees enclosing the aforesaid estimate No. 8 and reading as follows:

"E. L. MALVANEY, A. I. A.
Architect
Jackson, Mississippi
July 6, 1951

Board of Trustees
Meadville Schools
Meadville, Mississippi
Gentlemen:

Enclosed is estimates of L. Chester Owens. There is a balance due on original contract of $15,347.38. If the entire 15% is retained there will be due this estimate $1,544.09. Mr. Owens wishes to draw $11,000 of the retained percentage in order to meet an obligation in Meadville. If the Board wishes to make this advance, this office approves. This would leave a balance of

$2,803.29 which should be sufficient to complete the contract.''

Yours very truly,
E. L. Malvaney''

ELM :ml''

This letter with the estimate enclosed was delivered by the architect to the contractor and without previous submission or presentation to the board of trustees, the contractor presented the letter and estimate to the office of the County Superintendent of Education, and a deputy of the superintendent of education, the superintendent himself being absent, issued a certificate to the contractor directed to the chancery clerk for the issuance of a warrant therefor, and such warrant was issued and delivered to the contractor. No order precedent to the issue of said certificate was ever made by the board of trustees, nor was the aforesaid letter of the architect enclosing said estimate No. 8 ever presented to the board of trustees, nor was the board of trustees ever called upon to pass on or determine any right of the contractor to the payment of the funds shown by said estimate to be retainage funds, the release of which was by the architect in his said letter approved if the board wished to release such retainage funds. Upon the receipt by the contractor of the warrant from the chancery clerk, and on the same day that he obtained it, he carried the warrant to the Bank of Franklin and deposited the same to his credit in the bank, said warrant being in the amount of $12,544.09, and then issued his check to the bank in the sum of $12,073.34 in payment of an indebtedness claimed by him and the bank to be owing to the bank under a previous assignment made by the contractor to the bank of funds becoming due him under the contract in consideration of advances made by the bank to him of funds with which to pay labor and material going into the construction of the building. The amount of said warrant, towit, the sum

of $12,544.09, comprised the sum of $1,544.09 shown to be due on said estimate No. 8 and the sum of $11,000 representing partial payment of retainage funds.

At the time the architect delivered the aforesaid letter to the contractor, and at the time the contractor presented the same to the superintendent's office and obtained the issuance of the certificate, and at the time the contractor obtained the warrant from the chancery clerk and deposited the same to his credit in the Bank of Franklin, there were then outstanding and unpaid claims for labor and material which had gone into the construction of the building, amounting to the aggregate sum of $17,593.32. On July 12, 1951, the contractor advised his surety, the appellant, that he would be unable to proceed further with the contract and that it would be necessary for him to become in default in the performance thereof, and thereupon the board of trustees and the surety completed the contract at an additional cost of $972.00, which sum was paid out of the funds then remaining in the hands of the trustees. The aforesaid outstanding bills for labor and material, aggregating the sum of $17,593.32, were paid by the surety, appellant here, who, as each claim was paid, obtained from the claimant a written assignment of the claimant's rights as against the contractor. On October 9, 1951, the board of trustees, by final order entered on its minutes, approved the completion of the building and accepted the same and ordered the payment to the appellant, National Surety Corporation, of the balance in hand in the sum of $1,149.24. The superintendent of education issued his certificate to the chancery clerk for a warrant in this sum, payable to the surety. The warrant was never cashed by the surety.

The deputy superintendent of education admitted that when the contractor brought to the superintendent's office estimate No. 8, accompanied by the architect's letter, she issued the certificate without any order of the trus-

tees, although she had always had the approval of the trustees in issuing certificates in payment of prior estimates.

The only conflict in the evidence is that with reference to what transpired between Malvaney and the contractor at the time the architect approved estimate No. 8 and wrote the letter of July 6, 1951 to the trustees approving the payment to the contractor of retainage funds. This conflict arises out of the testimony of Malvaney, his secretary Miss Martha Lunceford, and the contractor, Owens.

Malvaney testified as follows as to what transpired when he approved the estimate No. 8 and issued his letter of July 6: "Mr. Owens came to the office that morning and submitted this estimate and it was checked and found to be correct in his figures. I asked him if his bills were paid and he said 'yes', and if the job was getting along all right, and he said that it was almost finished, and I approved the estimate as being correct and wrote a letter to the board of trustees calling attention to the fact if they wished to make partial payment on retainage, they could do so." Questioned as to whether or not Mr. Owens disclosed to him the nature of the obligation to the Bank of Franklin, he stated that he did not ask.

Malvaney's secretary, Miss Martha Lunceford, testified that she was present in Malvaney's office when Owens called on July 6, and on being asked what transpired in connection with Owen's request to obtain some part of the retainage funds, she answered: "As I recall, he came in and stated that the job was practically completed and that he had a note due at the bank and that he had borrowed money to run the job and wanted to pay his note, and Mr. Malvaney asked if the job had progressed all right and he stated it had, and that it was practically completed." She further testified that

Owens did not say anything at the time to Malvaney about having unpaid bills other than the note at the bank.

Owens, the contractor, when asked to state the conversation between him and Malvaney at the time he obtained from Malvaney the letter and the approval of his estimate No. 8, testified as follows:

"I made the statement I owed the bank and some other bills and he asked how I was getting along on the job, and I told him the job was progressing nicely.

"Q. There was no question as to who you owed?

"A. There was no question as to who I owed, other than I mentioned the bank and some other bills.

"Q. You mean there was no inquiry as to what bills you did owe?

"A. No, he did not ask me relative to what I owed.

"Q. And asked no questions as to what bills you owed?

"A. No."

At the conclusion of the evidence, the chancellor, in a written opinion, held that the Bank of Franklin was innocent of wrong doing or negligence in the premises, and dismissed the bill of complaint as to the bank. He held also that the county superintendent of education, Mr. Boggan, acted in good faith and with full authority in issuing the certificate upon which the chancery clerk issued the warrant in question, and that, therefore, both Boggan and the United States Fidelity and Guaranty Company, his surety, incurred no liability, and he accordingly dismissed the bill of complaint as to them. He held, however, that Malvaney, the architect, was negligent in approving the release of the retainage funds without due diligence to ascertain whether there were outstanding bills for labor and materials, and that the appellant, National Surety Corporation, was likewise guilty of negligence equal in proportion to that of the architect in that the said National Surety Corporation made no inquiry about the performance of the con-

tract, or as to the bills unpaid or outstanding, or as to the delay in the fulfillment of the contract, and manifested no interest in the contract until after the contractor's default. On the basis that the contractor and the architect were equally guilty of negligence, the court awarded a decree against Malvaney and in favor of the National Surety Corporation for $5,500, being one-half of the amount of the retainage funds released with the approval of the architect.

The claimed liability of Malvaney and Boggan and his surety, to the appellant, National Surety Corporation, is predicated by the appellant upon the claimed wrongful and negligent release by them of the retainage funds which resulted in depriving the appellant of resort thereto under the doctrine of equitable subrogation to the rights of the contractor.

The appellee, Malvaney, contends that the retainage is not a trust fund and that there is no lien thereon, either legal or equitable, for the benefit of the surety or other person. He concedes that such right as the surety may have in the retainage funds is by virtue of the doctrine of equitable subrogation. He argues, however, that the surety's right of subrogation did not arise until its cause of action accrued and that such cause of action did not accrue until either July 12, 1951, when the contractor gave notice of his default, or subsequently when the surety paid the outstanding bills for labor and materials. Hence he says that at the time the surety's right of subrogation arose, the retainage funds in the amount of $11,000 had been paid to the contractor and constituted no part of the funds in the hands of the trustees for subjection under the surety's right of subrogation. He therefore contends that the only funds which the surety could claim under the right of subrogation were those remaining in the hands of the trustees after the payment to the contractor of the sum of $12,544.09 on July 6, 1951, as shown on the contractor's estimate No. 8, which sums so paid to the contractor embraced

$11,000 of the retainage funds and left in the hands of the trustees the sum of $2,803.29, which latter sum was sufficient to complete the contract except as to the payment of the outstanding bills for labor and materials. In other words, it is the position of the appellee that no right of subrogation existed in the surety as to the $11,000 retainage because such right of subrogation did not accrue until after said sum had been paid out and no longer remained in the hands of the trustees.

It is further contended by the appellee, Malvaney, that there was no privity of contract between him and the surety, and that he owed no duty to the surety, either by virtue of the contract or otherwise, and, therefore, can not be held liable to the surety regardless of negligent conduct and resulting damage, and that even if he be held negligent in approving the release of the retainage funds, the surety is barred of recovery against him because of its own contributory negligence.

 The rights and status of a surety on a performance bond with respect to progress payments and retainage funds under a construction contract such as is here under review are no longer in doubt under the decisions of this Court. While numerous authorities have been cited by counsel on both sides, we need only refer to a few. In the cases of First National Bank of Aberdeen v. Monroe County, et al., 131 Miss. 828, 95 So. 727, and Mississippi Fire Insurance Company v. Evans, 153 Miss. 635, 120 So. 738, we held that in a contest between the contractor's assignee and the surety, the surety had no superior equity in the progress payment funds over the assignee which entitles it to have such funds applied in exoneration to the payment of claims for labor and materials which accrued prior to the contractor's default. On the other hand, we have expressly held in the cases of Canton Exchange Bank v. Yazoo County, et al, 144 Miss. 579, 109 So. 1, and Jackson Lumber Company v. Moseley, et al., 193 Miss. 804, 11 So. 2d 199,

that where the contract provides for progress payments not to exceed 85 per cent of the contract price and 15 per cent retainage, the retainage is for the mutual benefit and protection of the owner and the surety and that where the surety, upon default of the contractor, is required under its bond to pay bills for labor and materials going into the construction, he may assert a claim to the retainage funds under the equitable doctrine of subrogation, and that such right of subrogation begins as of the date of the execution of the bond.

We do not agree with the appellee's contention that the appellant's right of subrogation did not arise until either July 12, 1951, when the contractor gave notice of his default, or subsequently when the surety paid the outstanding bills for labor and materials. The contractor testified that he knew that he was going to default on his contract when he obtained the release to him of the $11,000 retainage, and he was then in default in the payment of labor and materials in a sum in excess of $17,500. The surety was entitled to have said sum of $11,000 retained, subject to its equitable right of subrogation, in the event the contractor failed to fulfill his contract. The fulfillment of his contract required not only that he complete the structure but that he also pay for all labor and material therefor. Jackson Lumber Company v. Moseley, supra. The surety's right of subrogation began on the date of the execution of the bond and was therefore vested in the surety at the time the retainage funds were released to the contractor. It is argued by the appellee, however, that the architect, Malvaney, owed no duty to the surety either under the contract or otherwise, with respect to the retainage funds. We think he did. Under the provisions of Section 9014 of the Mississippi Code of 1942, the contractor was required to furnish bond not only for the completion of the building, but with the additional obligation that he would make prompt payments to all persons supplying labor and materials for the job. Such additional obliga-

tion is required to be read into the bond whether the bond expressly so provides or not. Magee Commercial Bank v. Evans, 145 Miss. 643, 112 So. 482. The architect prepared the contract on a form provided by him, and he knew its provisions with reference to the retainage and the purpose thereof. He was charged with knowledge of the law which imposed upon the surety, in the event of the default of the contractor, the obligation to pay labor and material bills. The bond by its terms incorporated therein the contract. The architect knew, or should have known, when he authorized the release of the $11,000 retainage that the surety would be deprived of the protection thereof in event of default on the part of the contractor in completing the structure and paying outstanding bills for labor and material. Commenting upon an analogous contractual arrangement in the case of Jackson Lumber Company v. Moseley, supra, this Court said:

"This was a three-way arrangement, consisting of the building contract, including the plans and specifications, the bond and the application therefor, with the mutually interdependent obligations and rights therein contained. The contract obligated the contractor not only to go forward and complete the structure but also to pay for all materials and labor therefor."

The contractual arrangement here consisted of the building contract, including the plans and specifications, and the bond which incorporated the contract as a part thereof, with the mutually interdependent obligations and rights therein contained. The duties of the architect were clearly defined in the contract. One of his very important duties was not to approve progress payments in excess of 85 per cent of the contract price, and before final payment to make an inspection to find if the work was acceptable under the contract and if the contract had been fully performed, and to require the contractor to submit satisfactory evidence that all payrolls, ma-

terial bills, and other indebtedness connected with the work have been paid.

■■■ This duty was owing both to the trustees and the surety, for whose mutual benefit and protection the retainage funds were provided. A contractual relation between the architect and the surety was not requisite to the existence of this duty. It arose out of the general contractual arrangements which contained mutually interdependent rights and obligations.

"On the other hand, a contractual relation between the parties is not necessary to the existence of a duty the violation of which may constitute actionable negligence, where the relation which is requisite to the existence of a duty to exercise due care, is to be found in something else." 38 Am. Jur., Sec. 21, p. 663.

■■■ There is still another basis for holding that the architect owed a duty to the surety not to approve the release of the retainage funds prior to the completion of the contract, including the payment of bills for labor and materials. The architect, by his contract with the trustees, assumed the obligation to supervise the performance of the contract and to preserve the retainage funds to insure the completion of the contract, and it was apparent that his failure to exercise due care and diligence to ascertain if there were outstanding bills for labor and material before approving the release of the retainage funds might result in loss to the surety by depriving it of its rights under the doctrine of subrogation to resort to such funds upon the default of the contractor. The architect, therefore, undertook the performance of an act which, it was apparent, if negligently done would result in loss to the surety, and the law imposed upon him the duty to exercise due care to avoid such loss. We quote from 38 Am. Jur., pages 656-657, the following:

"Accordingly, the law imposes upon every person who undertakes the performance of an act which, it is

apparent, if not done carefully, will be dangerous to other persons or the property of other persons, the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or to property which is directly attributable to a breach of such duty. The duty so arising is absolute. The law requires nothing more; it will excuse nothing less than performance, although the degree of care to be exercised is relative to the circumstances of the case."

The chancellor found that the appellee, Malvaney, was guilty of negligence in approving the release of the retainage funds without exercising proper diligence to ascertain that outstanding bills for labor and materials had been paid. We think there was ample evidence to sustain this finding of the chancellor. Malvaney himself does not claim that he did other than ask the contractor if his bills were paid and if the job was getting along all right. He made no requirement that the contractor submit evidence of any kind that bills for labor and material had been paid. Malvaney's secretary testified that the only inquiry which Malvaney made of the contractor was whether the job had progressed all right. On the other hand, the contractor testified that he told the architect that he wanted the retainage money to pay his obligation at the bank and other bills, and that no questions were asked by the architect as to what bills he owed. The architect did not even inquire as to the nature of the contractor's obligation to the bank. So far as the information disclosed was concerned, it might have been an obligation wholly disassociated from the contract. The chancellor found from this evidence that the architect was negligent in thus approving the release of the retainage funds without exercising proper diligence to ascertain if there were outstanding and unpaid bills for labor and materials, and we think he was amply justified in so doing. It is readily apparent that the act of the architect in approving the release of the

retainage funds was a contributing cause to the ultimate release of the funds which resulted in depriving the surety of its right to resort to these funds under the equitable doctrine of subrogation, resulting in loss to the surety to the extent of the amount of the funds released. By his negligent act, he set in motion that which ultimately resulted in the release of the retainage funds.

It is argued by the appellee, Malvaney, however, that the chancellor likewise found that the surety was guilty of contributory negligence in that it made no inquiry about the performance of the contract or the outstanding bills for labor and materials, and that it manifested no interest in the contract during its performance or until after the contractor's default. We think the record in this case reveals no evidence to support a finding by the chancellor that the surety was guilty of any negligence resulting in the release of the retainage funds. Prior to the release of the $11,000 retainage, no retainage funds had theretofore been released and we think the surety had the right to assume that none would be released until the contract had been fully performed by the completion of the structure and the payment of outstanding bills for labor and materials. No notice was given to the surety that the release of retainage funds prior to the completion of the contract was contemplated and there was no reason for the surety to anticipate that such would be done. It is not a case where retainage funds were released over such period of time that the surety should have known that such was happening and silently acquiesced therein. The surety had no opportunity to protest against such release. We are, therefore, of the opinion that the finding of the chancellor that the surety was guilty of negligence in the release of the retainage funds is wholly unsupported by the evidence, and that the argument of the appellee, Malvaney, that the surety is barred of recovery by its own negligence is not well founded, even

if it be assumed that our comparative negligence statute (Sec. 1454, Code 1942) does not apply, which question we do not here decide.

 It is contended by the appellees, W. E. Boggan and his surety, the United States Fidelity and Guaranty Company, that the said Boggan, in issuing the certificate for the payment of the retainage, incurred no personal liability for the reason that the said Boggan acted in good faith and in the honest belief that he was authorized to issue the certificate. We recognize the well founded rule announced in Paxton v. Baum, 59 Miss. 531, and subsequent decisions of this Court, that an officer exercising a quasi-judicial function incurs no personal liability if he acts in good faith in a matter within the range of his jurisdiction. We call attention, however, to the statement of this Court in the case of Barnett, Auditor v. Lollar, 197 Miss. 574, 19 So. 2d 748, as follows:

"What we have hereinbefore said in discussing the first of these questions deals with the general principles. We are not to be understood as holding, as respects the expenditure of public funds, that any payment, whatever it is, will be without any personal liability on the part of the officer if only the purpose of the payment was somewhere within the general field of his jurisdiction. A payment may be within that general field and yet so clearly and distinctly one which the officer could not lawfully make as to bar him from justification in taking the position that he did it in good faith and honest error."

 We think that the act of the superintendent, through his deputy, in issuing the certificate in this case was one which he was so clearly and distinctly not lawfully authorized to do that he is barred from justification in taking the position that he did it in good faith and honest error. It was not even within the range of the authority of the superintendent to pass upon the ques-

tion of the release of the retainage funds. The papers which were submitted to the superintendent by the contractor showed on their face that the question of releasing the retainage funds was one for the determination of the trustees, and that the trustees had not authorized such release, or even acted upon the matter. It was wholly without the range of the authority of the superintendent to issue the certificate in the absence of authority from the trustees, and the papers presented to the superintendent showed that no such authority had been given. His act in issuing the certificate under the circumstances constituted a failure to well and faithfully perform the duties of his office and was a violation of the condition of his official bond. His action was one of the contributing causes which resulted in the release of the retainage. The superintendent, in issuing the certificate, became one of the principal actors in the chain of events which resulted in releasing the retainage and depriving the surety of its right to resort thereto under the doctrine of equitable subrogation. The act of the superintendent concurred with that of the architect in releasing the retainage funds, and both became liable to the surety for the latter's loss in the amount of the retainage funds released. It follows, of course, that the surety on the superintendent's bond became likewise liable to the extent of the penalty of the superintendent's official bond.

It follows from the views hereinbefore expressed that the decree of the court below should be and it is reversed and judgment rendered here for the appellant, National Surety Corporation, against the appellees, E. L. Malvaney, W. E. Boggan, and the latter's surety, the United States Fidelity and Guaranty Company, for the amount of the retainage funds released, towit, the sum of $11,000, the liability of the said United States Fidelity

and Guaranty Company being limited to the amount of the penalty of its bond.

Reversed and judgment here for appellant.

*Roberds, P. J.,* and *Hall, Lee,* and *Kyle, JJ.,* concur.