**AMERICAN CASUALTY COMPANY, Plaintiff,**

v.

**BOARD OF EDUCATION OF INDEPENDENT SCHOOL DISTRICT, NO. 2, CLEVELAND COUNTY, MOORE, OKLAHOMA, et al., Defendants.**

No. 9639.

United States District Court
W. D. Oklahoma.

March 23, 1964.

Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., for American Cas. Co.

Blumenthal & Gray, Oklahoma City, Okl., for Board of Education of Independent School Dist. No. 2, Cleveland County, and Board Members.

Pierce, Mock, Duncan, Couch & Hendrickson, Oklahoma City, Okl., for B. Gaylord Noftsger, Martin Lawrence, Robert M. Lawrence, Thomas H. Flesher, and Noftsger-Lawrence & Associates.

DAUGHERTY, District Judge.

This is a dispute between the American Casualty Company, who as plaintiff sues the defendants, Board of Education of Independent School District, No. 2, Cleveland County, Moore, Oklahoma, and the individual members of said Board, Noftsger-Lawrence and Associates, a co-partnership, and the W. R. Lowe Building Company, a corporation, and W. R. Lowe and Kenneth Lowe, Individually.

In view of the positions occupied by the parties in this controversy the plaintiff will hereinafter be called the Surety, the defendant, Board of Education the Owner, the defendant architect partnership the Architect and the defendant Construction Company and the individual members thereof the Contractor.

On June 28, 1960, the Owner entered into an owner-architect agreement with the Architect. On February 6, 1961, the Owner entered into a construction contract with the Contractor. Both contracts pertained to the construction of a cafeteria and classroom addition to the existing high school building in Moore, Oklahoma. The construction contract was in the amount of $289,939.00. The architect contract called for a fee of $17,364.-34.

The Contractor furnished a separate performance bond, payment bond and maintenance bond in connection with the said construction project, each separate bond having the plaintiff as surety thereon. These three separate bonds were furnished at approximately the time the said construction contract was entered into.

The owner-architect agreement provided in part that:

"The Architect's services shall consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications and detail drawings, and the supervision of the work by visiting the site from time to time during the progress of construction to be assured that the work is being carried out by the Contractor in strict compliance with plans and specifications, but the Architect does not guarantee performance by the Contractor."

The construction contract provided in part that:

"Within the first ten (10) days of each calendar month, the Owner shall make partial payments to the Contractor for work performed during the preceding calendar month on estimate certified by the Architect and the Owner. Ten per cent (10%) of each such approved estimate shall be retained by the Owner until final completion and acceptance of all work covered by contract. Upon completion of all work, and compliance with the contract, the Owner's Architect shall issue a Certificate of Completion, based on final measurements of all work completed, and the Owner shall, within a reasonable time, pay to the Contractor the balance due under the terms and conditions of the Contract."

The owner-architect agreement did not provide that the Architect would approve or certify monthly estimates of the Contractor and upon completion issue a Certificate of Completion, but in fact such responsibility was undertaken and accomplished by the Architect as clearly shown by certain exhibits put in evidence. Monthly estimates were so certified beginning in March, 1961. They continued, and on December 8, 1961, the Architect made an inspection and prepared a so-called "Punch List" which set out 15 minor items yet to be done or corrected. A final inspection was made on or about December 14, 1961, and under date of December 15, 1961, the Architect reported in writing that the building was complete according to plans and specifications and recommended that it be accepted with some 24 minor listed exceptions. At this time the final estimate was certified and approved by the Architect with $500.00 withheld from the construction funds for these 24 incomplete items. Under date of December 28, 1961, the Architect in

a letter to the Contractor reported that another inspection had been made and 14 of the said 24 minor listed incomplete items were stated not yet to have been corrected.

In late December, 1961, (apparently on Friday before Christmas), the Contractor notified the Surety for the first time that it could not pay its bills on the job. The Surety thereafter in due course (and of course, after the retainage fund was released), paid approximately $58,291.53 to satisfy unpaid labor and material bills of its principal, the Contractor, relating to the project.

All of the incomplete items were eventually corrected or supplied and were effected by the Contractor except that apparently the Surety in paying the bills did guarantee and pay for a set of black-out drapes (on the 24 item list) costing $120.00 which were not installed until April, 1962. The said $500.00 fund withheld as above stated is still available to cover this item of completion expense.

No one requested the performance bond Surety to complete or perform the contract under the performance bond and it does not appear that it did. It appears from the evidence that the construction work was fully performed by the Contractor with the possible exception of the black-out drapes as above outlined. In fact, it appears that such work was substantially completed by the Contractor much earlier than the December activities above related for on or about September 1, 1961, the classrooms were occupied and used by the Owner and on or about November 1, 1961, the cafeteria was occupied by the Owner and meals were being served in the same by November 10, 1961.

Through September, 1961, estimates had been approved by the Architect totaling $281,149.10, of which $253,034.19 had been paid to the Contractor, and $28,114.-91 had been retained by the Owner under the 10% retainage right in the construction contract. On October 20, 1961, when the work was substantially completed, the Contractor applied for 75% of the retainage held by the Owner and the Architect approved for payment the sum of $20,000.00 on this request. The final estimate (less the said $500.00) was approved for payment by the Architect on December 14, 1961, in the amount of $15,-207.81, and paid by the Owner on December 15, 1961. The total construction cost finalized out at $288,742.00.

It does not appear from the evidence that the Owner or Architect had any knowledge of the bad financial condition of the contractor or its non-payment of bills on the project, until late in December, 1961, and after all construction funds had been released save the said $500.00, nor apparently did the Surety have any such knowledge until then except on November 13, 1961, the Surety did learn that a sub-contractor had failed to pay a bill, and on December 13, 1961, the Surety received a complaint from a Lumber Company that the Contractor owed it a bill which was past due and unpaid.

The plaintiff Surety contends herein that because the owner released the 10% retainage before all the work had been completed it impaired the Surety's rights of subrogation and exoneration and is liable to the plaintiff for the amount of said retainage and that the Architect in issuing a final certificate of completion and approving release of the retainage to the Contractor before all of the work had been completed, likewise impaired the Surety's rights of subrogation and exoneration, and is also liable to plaintiff for the amount of retainage. It is claimed by the Surety that such retainage amounted to $25,207.81. In support of this contention the plaintiff asserts that such retainage provision in the construction contract between the Owner and the Contractor was for the benefit of the Surety on the payment bond under which said $58,291.53 in bills of the Contractor were paid, and that the contract relationships existing between the Owner and Contractor and the Owner and Architect plus the Architect undertaking to certify monthly estimates for payment and is-

suing a final certificate of completion, created a duty of due care in the premises flowing from the Architect to the Surety on the payment bond which was violated to the detriment of said Surety.

The Owner contends that the retainage provision of the construction contract gave it a right or privilege which it could exercise as it saw fit, and that such provision was not for the benefit of the plaintiff as surety on the payment bond, but as between the Owner and the payment bond Surety was purely for the benefit of the Owner. Further, that the payment bond was required by the statutes of the State of Oklahoma with the Contractor as principal and the State of Oklahoma as obligee, and was for the benefit of laborers and materialmen engaged by the Contractor; that the Surety was not a party to the construction contract or the owner-architect agreement, nor was the Owner a party to the statutory payment bond; that the construction work was substantially completed and the retainage fund released and paid to the Contractor on certification of the Architect before the Surety gave any notice to the Owner or made any claim against said retainage fund or any construction funds in the hands of the Owner.

The Architect contends that it had no contractual obligation to certify monthly estimates for payment or issue a final certificate of completion, had no privity with the payment bond surety, did however correctly certify monthly estimates based on work performed and issued the final certificate of completion when the work was all completed by the Contractor except a very few minor items for which sufficient funds were withheld. Both the Owner and the Architect point out that there was no contractual obligation or course of conduct actually pursued by either which required or involved the ascertainment by them or either of them that the Contractor was paying his bills as the work progressed or when it was completed; that the retainage was for the benefit of the Owner to assure that the work was performed and completed by the Contractor according to the plans and specifications, which was in fact fully accomplished.

Inasmuch as there were three separate bonds on this construction project with the plaintiff as surety on each, it is believed important at the outset to demonstrate the distinction between the two of the three that are pertinent here, namely, the performance bond and the statutory payment bond, particularly, with reference to the retainage provision in existence in the construction contract involved and the rights, duties and obligations of each type surety.

The obligation of a surety on a performance bond, upon default of the principal or contractor, is to perform or finish the work agreed upon or pay the owner the cost of performing or finishing the work. The obligation of a Surety on a payment bond is not to perform or finish the work or pay the cost of performing or finishing the work but is to pay any unpaid bills of the contractor or principal relating to the job. The nature of the two obligations is obviously distinct and different. This has eventually led to the general requirement for separate bonds to avoid confusion and indeed the Miller Act, for example, is now specific in this requirement. In Oklahoma the statutory payment bond is mandatory on public construction whereas a performance bond is optional to the owner. The obligee of a statutory payment bond is the State of Oklahoma whereas the obligee in a performance bond is the owner. It should be observed that the owner and the surety on a performance bond are both interested in the completion or performance of the work, and the monthly estimates and retainage provisions may be said to have a bearing on this mutual interest. However, in a public construction project where the owner has no contractual dealings with the laborers and materialmen of the contractor, and such laborers and materialmen cannot acquire liens on public buildings or lands, the owner has no concern or in-

terest in the payment of the laborers and materialmen. The Oklahoma Supreme Court in Federal Surety Co. v. St. Louis Structural Steel Co., 111 Okl. 208, 239 P. 154 said:

"The structure involved in this case is a public building, and a mechanic's lien would not run against the structure under any circumstances. The owner is not concerned in the question of whether the materialman receives compensation for material furnished. The bond in this case represents a contract between the surety company and the state of Oklahoma for the benefit of third parties. The consideration which moved the surety company to enter into the contract in this case was the premium it received for undertaking to guarantee the performance of the builder's contract on the part of the contractor. There is no privity of contract between the surety company and the owner. Our statute authorizes the execution and delivery of contracts for the benefit of a third party, and the surety bond involved in this might have been executed in the same form and for the same purposes, in the absence of a statute. The considerations which support the surety bond are entirely different from those considerations which support a mechanic's lien against the owner for material sold and delivered to the contractor. It would not appear that cases involving the conditions which support a mechanic's lien would be helpful in determining the construction which ought to be placed upon the statute and bond involved in this case, for the reason that the bond rests upon different conditions."

The payment of such bills is then not in the mutual interest of the owner and the surety on the payment bond but is the sole interest of the payment bond surety (with its principal, the contractor, of course), or those primarily and secondarily liable. Moreover, the Oklahoma Supreme Court in Metropolitan Casualty Insurance Company v. United Brick & Tile Co., 167 Okl. 402, 29 P.2d 771, has held that a retainage type provision in a construction contract to which the surety is not a party is for the benefit of the public owner and not the Surety Company. The following expression is found in such opinion:

"Defendant surety company lays particular stress upon the fact that the specifications provided that the city could withhold payment of any of the funds and apply same in payment of claims for labor and material due on the job if bills on the contract were not paid. The contract provides:

" 'No moneys, payable under contract, or any part thereof, shall become due and payable, if the Commission so elects, until the Contractor shall satisfy the said Commission that he has fully settled or paid for all materials and equipment used in or on the work and labor done in connection therewith, and the Commission, if it so elects, may pay any or all such bills, wholly or in part and deduct the amount or amounts so paid from any partial or final estimate.'

"The defendant surety company argues that it is a party to the above contract and by reason of the provisions thereof it acquired a lien on the funds paid on the contract to the extent that it had the right to demand that payments made on the contract would be used to pay labor and material bills on the contract. Such contention is without merit for the reason that the surety company is not a party to said contract and for the further reason that said contract was made for the benefit of the city and not for the surety company and we are not herein dealing with funds in hands of the city."

The payment bond in this case under which the Surety paid approximately $58,-291.53 is required by law in Oklahoma on

public construction. The Oklahoma Statutes are 61 O.S.A. §§ 1 and 2, which provide as follows:

"§ 1. Bond to be taken on public works.—

"Whenever any public officer shall, under the laws of the State of Oklahoma, enter into contract in any sum exceeding One Hundred Dollars ($100.00) with any person or persons, for the purpose of making any public improvements or constructing any public building or making repairs on the same, such officer shall take, from the party contracted with, a bond with good and sufficient sureties to the State of Oklahoma, in a sum not less than the sum total in the contract, conditioned that such contractor or contractors shall pay all indebtedness incurred for labor, materials, and/or repairs furnished in the construction of said public building or in making said public improvements."

"§ 2. Filing of bond—action on bond.—

"Such bond shall be filed in the office of the clerk of the district court of the county in which such public improvement is to be made or such public building is to be erected, and any person to whom there is due any sum for labor, materials, and/or repairs, furnished as stated in preceding sections, or his assigns, may bring an action on said bond for the recovery of said indebtedness, provided, that no action shall be brought on said bond after six (6) months from the completion of said public improvements or public buildings."

It must be conceded by all that these statutes were enacted by the Oklahoma legislature as a matter of public policy to afford protection to laborers and materialmen on public construction projects by giving them a payment bond to look to for their wages and materials since upon default of their contractor they have no contractual rights against the owner and no lien rights against the

public land or improvements. Hutchinson v. Krueger, 34 Okl. 23, 124 P. 591, 41 L.R.A.,N.S., 315. It should be noted that a payment bond under these statutes runs to the State of Oklahoma as obligee and not to the public entity owning the property in this case; that the public entity involved has no duty as such to take such a bond but this requirement is placed on the individual public officer involved; that this bond is not filed with the public entity involved but is filed with the clerk of the State district court; and if default is made and laborers or materialmen are not paid, it is they, and not the public entity, who must take legal action against such bond.

The Oklahoma Supreme Court has had occasion to construe and interpret these statutes and payment bonds required thereunder on several occasions. This Court is bound by such interpretations. Erie R. R. Co. v. Tompkins, 304 U. S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Elmendorf v. Taylor, 10 Wheat. (U.S.) 152, 6 L.Ed. 289. The Oklahoma Supreme Court has held that these bonds are not for the benefit of the public entity involved but are for the benefit of laborers and materialmen. In Wilson v. Nelson, 54 Okl. 457, 153 P. 1179, 1183, the Oklahoma Supreme Court said in connection with a payment bond required by the Oklahoma Statutes:

"The section of the statute in question was intended solely for the protection of materialmen and laborers dealing with contractors upon public works, and the conditions required to be inserted in the bond are for the benefit of materialmen and laborers alone, and not for the benefit of the municipality making the contract."

Also, see Klein v. Beers, 95 Okl. 80, 218 P. 1087.

Further, such a bond is a contract between the Surety and the State of Oklahoma for the benefit of third parties, namely, the laborers and materialmen and that there is no privity between

the payment bond surety and the owner of the public property. Federal Surety Co. v. St. Louis Structural Steel Co., supra. And, if the responsible public official fails to heed the statute and take such a bond in conjunction with a contract for public construction, nevertheless, the unpaid and unsecured laborers and materialmen may not look to or collect from the public entity involved. Frensley Bros. Lumber Company v. Scott, 117 Okl. 133, 245 P. 615, and Electric Supply Company v. City of Muskogee, 171 Okl. 130, 42 P.2d 140.

From the wording of the statutes and these interpretations, it becomes quite clear that the intent of the Oklahoma legislature was to protect laborers and materialmen on public construction by affording them a payment bond to look to but at the same time to very carefully divorce or insulate the public entity owner from any involvement in such payment bond or its procedural aspects.

■ It is also pertinent to recognize those rulings of the Oklahoma Supreme Court which hold that a statutory payment bond required by 61 O.S.A. § 1, may not be added to or subtracted from and that anything added may be rejected as surplusage and anything deducted is supplied by operation of law or by the statute. Lowe v. City of Guthrie, 4 Okl. 287, 44 P. 198; W. S. Dickey Clay Mfg. Co. v. Ferguson Investment Company, Inc., Okl., 388 P.2d 300; United States Fidelity & Guaranty Co. v. Cook, 105 Okl. 185, 231 P. 495 and New York Casualty Co. v. Wallace & Tiernan, 174 Okl. 278, 50 P.2d 176. In other words, the statutory payment bond is treated as being separate and distinct and stands alone under the controlling statute.

In view of the foregoing it is necessary in this case that the Court treat with the plaintiff as a surety on a statutory payment bond with the attendant rights, duties and obligations as such and not as a surety on the optional performance bond with the attendant rights, duties and obligations thereunder.

■■ Plaintiff urges that its right of subrogation against the owner has been impaired. The plaintiff as surety would have subrogation rights or would stand in the shoes of the laborers and materialmen whose unpaid bills it pays when the same are paid. 15 O.S.A. § 382 so provides. But the plaintiff as a surety would only stand in the shoes of the laborers and materialmen and would have no greater rights in subrogation than they possess. It is elementary that one cannot acquire by subrogation what another, whose rights he claims, did not have. United States v. Munsey Trust Co., 332 U.S. 234, at page 242, 67 S.Ct. 1599, 91 L.Ed. 2022. The laborers and materialmen have no rights against the School Board Owner for their unpaid bills. The Oklahoma Supreme Court in Electric Supply Company v. City of Muskogee, supra, has held that a retainage provision in a construction contract is for the benefit of the owner and not for the benefit of laborers and materialmen. Such case provided:

"The plaintiff in error contends that there was a provision in the contract between the city of Muskogee and the contractor that the city would pay the contractor, subject to the proof of account for the material used and the work done, and proper showing made of the payment of all outstanding accounts, and that therefore all such bonds were made for the benefit of the materialman, that the city could be liable to the plaintiff in error for the work done and material used by it if it violated the terms of its contract with the contractor in paying the said contractor before it had knowledge of the payment of all claims of materialmen against the contractor for work and material used in the construction of said improvement. * *

"We think under the facts and the law of this state that the city of Muskogee is not liable in the plaintiff's action, and that the judgment of the trial court should be affirmed."

Therefore, since the retainage fund in this case was for the sole benefit of the

School Board Owner to assure performance of the work agreed upon and not to assure the payment of bills, the School Board Owner, as far as the laborers and materialmen and anyone who might stand in their shoes are concerned, could release the fund and when so released there is simply nothing left against which to apply the doctrine of subrogation. The payment bond surety via subrogation has no greater rights than the laborers and materialmen had in said retainage provision or construction fund. It is one thing perhaps to say that the laborers and materialmen could enforce rights against a construction fund captured in the hands of the public owner, but it is quite another situation when there is no fund in the hands of the public owner to claim subrogation rights against. Metropolitan Casualty Insurance Company v. United Brick & Tile Co., supra; Prairie State Nat. Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, and Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547. The last two cases deal with construction or retainage funds still in the hands of the owner but go no further. It is well said that innocent taxpayers should not be doubly penalized. Joseph Nelson Supply Co. v. Leary, 49 Utah 493, 164 P. 1047, and E. I. duPont de Nemours & Co. v. City of Glenwood Springs, 8 Cir., 19 F.2d 225.

■ The plaintiff also urges the right of exoneration and defines such right as the ability of the surety to force its principal, in this case the Contractor, to pay its obligations before a loss is incurred. Plaintiff urges that this right be extended through its principal to the obligee in the bond. In the first place, such obligee is the State of Oklahoma and not the defendant School Board Owner. In addition, the same underlying principles discussed above with reference to the right of subrogation would apply to this right.

If the principal has no right against the public entity in this case then the surety has no right. A surety on a payment bond might have some such asserted right of exoneration to force some particular application of a construction or retainage fund in being in the hands of a public entity, but when no such fund exists in the hands of such public entity the payment bond surety must look to its principal, the one primarily liable and from whom it took compensation to assume the risk. Metropolitan Casualty Insurance Company v. United Brick & Tile Co., supra; Prairie State Nat. Bank v. United States, supra; Henningsen v. United States Fidelity & Guaranty Co., supra. 15 O.S.A. §§ 381 and 382 provides that a surety must look to its principal for reimbursement.

The cases [1] relied upon by the plaintiff are either performance bond and not payment bond cases or a statutory combination type bond or involve a retainage provision that provides that the owner and/or architect will hold such funds until the contractor furnishes proof that all labor and material bills have been paid or involve situations where construction or retainage funds have been captured by the surety in the hands of the public entity before release or involve a state rule of law contrary to the rule in Oklahoma with reference to whether such a contract provision is for the benefit of a surety. We are not here dealing with a performance bond or a statutory combination type bond but singularly with an Oklahoma statutory payment bond, and we do not have here such a retainage provision. There is no contractual obligation here on the part of the owner or architect to ascertain at any time that the contractor has paid his bills. Such would appear in this case to be solely the business of the contractor and his payment bond surety, the plaintiff. The statutory payment bond here is not for the benefit of the

1. Ft. Worth Independent School District v. Aetna Casualty & Surety Co., 5 Cir., 48 F.2d 1, 77 A.L.R. 222; Hochevar v. Maryland Casualty Co., 6 Cir., 114 F. 2d 948; State for Use of National Surety Corp. v. Malvaney, 221 Miss. 190, 72 So.2d 424, 43 A.L.R.2d 1212; and Peerless Insurance Co. v. Cerny & Associates, Inc., D.C., 199 F.Supp. 951.

852

owner and the retainage provision pertains only to the matter of seeing that the work agreed to be performed by the contractor is actually performed and completed and in Oklahoma is only for the benefit of the owner.

■ In addition the plaintiff asserts that the architect and perhaps the owner are guilty of negligence in the manner in which they brought about final completion and release of the retainage fund. There is no written word or promise that the payment bond surety must be consulted in this process. There does not appear to be any foundation for an obligation to consult with the performance bond surety since the work agreed upon was performed by the contractor to the satisfaction of the architect and the owner. There was no contractual obligation on the part of the owner or architect that they would hold any money until the contractor paid his bills or furnished proof thereof. The payment bond surety had not advised or requested the architect or owner not to effect final clearance and completion or not to release any retainage funds. The owner had been in occupancy of the classrooms since September 1, 1961, and the cafeteria for a month and a half before final clearance was effected and the retainage funds fully released. The $288,000 job was finished and had been finished for months but for a few items not worth over $500.00, to finish which a fund in said amount was withheld. The contractor was entitled to his money. In these circumstances it is impossible to find the basis for tort liability against the architect or owner or to hold the architect or owner guilty of negligent conduct.

From what has been said it follows that in the circumstances of this case, and under the Oklahoma statutes involved, we are concerned here with the statutory payment bond required solely for the protection and benefit of laborers and materialmen on public construction and not with the performance bond; that the retainage provision in the construction contract was a privilege or right for the benefit of the Owner and not the payment bond surety which privilege or right the Owner could exercise for the assurance of the performance and completion of the work agreed upon by the contractor; that no duties ever fell upon the owner or architect by either contract, law or course of conduct to ascertain that the contractor's bills were paid before releasing any of such retainage; that once the owner became separated from the funds pertaining to the public construction project the plaintiff as payment bond surety, upon paying the bills, has no rights of subrogation or exoneration in the shoes of the laborers and materialmen or contractor to cause a public owner to pay twice for the building or any part thereof; that the retainage fund here was properly and reasonably released and paid in substantial compliance with the performance and completion of the work and with the construction contract; that it cannot be said that the owner or architect was guilty of negligent conduct in the handling of the retainage fund and in the completion procedures followed, but to the contrary the methods employed were normal and reasonable under the circumstances and in consonance with what would be reasonably expected under the construction contract.

Consequently, the plaintiff has no recourse against the owner or the architect and judgment should be entered dismissing the complaint against the owner and architect. Plaintiff is, however, entitled to judgment against its principal, the contractor, for the bills plaintiff paid which relate to the construction project involved, and also against the said $500.00 fund. Counsel will accordingly prepare a Judgment or Judgments to such effect for the signature of the Court.