CHEMICAL CONSTRUCTION CORPORATION, Appellant,

v.

CONTINENTAL ENGINEERING, LTD., Appellee.

CONTINENTAL ENGINEERING, LTD., Appellant,

v.

CHEMICAL CONSTRUCTION CORPORATION, Appellee.

No. 26008.

United States Court of Appeals
Fifth Circuit.

Feb. 25, 1969.

John Bingham, James H. Hancock, Martin, Balch, Bingham, Hawthorne & Williams, Birmingham, Ala., for Chemical Constr. Corp.

Macbeth Wagnon, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for Continental Engineering, Ltd.

Before THORNBERRY and AINSWORTH, Circuit Judges, and DAWKINS, District Judge.

AINSWORTH, Circuit Judge:

This is a diversity case arising out of a multistate cost-plus-fixed-fee subcontract for the engineering and construction of a fertilizer handling and storage facility on the Arkansas-Louisiana Gas Company (ARKLA) site at Helena, Arkansas. Continental Engineering, Ltd. (Continental), an Alabama corporation and subcontractor, sued Chemical Construction Corporation (Chemico), a New York corporation and ARKLA's prime contractor, for a $540,000 equitable fee adjustment and for $400,000 in allegedly incurred but non-reimbursed costs. The trial court directed a verdict for Chemico on the fee adjustment issue (Count One) and submitted the 18 separate cost items (Count Two) to the jury, after reserving judgment pursuant to Fed.R.Civ.P. 50(a), with instructions that a special verdict be rendered as to each cost item. The jury returned verdicts in Continental's favor on 16 of 18 cost items. Judgment thereon was entered but later modified when the trial court granted Chemico judgment notwithstanding the verdict with respect to two of the cost items relating to overtime bonuses to exempt employees ($14,127) and to overhead on job shoppers ($31,149). Chemico's motion for judgment n. o v. as to certain other cost items was denied.

Chemico appeals from the denial of its motion for judgment notwithstanding the verdict with respect to two cost items which pertain to sand ($66,108) and to shop detail drawings ($137,653). Continental cross-appeals from the judgment entered upon a directed verdict for Chemico on the equitable fee adjustment issue and from the judgment for Chemico notwithstanding the verdict on the two disputed overtime bonuses and job shopper overhead cost items. Without detailing the complex procedural history and factual context of this case, this Court's appellate review is limited to only five controverted issues: Did the district judge properly grant Chemico a directed verdict on the equitable fee adjustment issue; was the trial court correct in granting Chemico judgment notwithstanding the verdict on two disputed cost issues, namely, the overtime bonuses and job shopper overhead items; and in denying Chemico judgment notwithstanding the verdict on the other two

cost issues relating to sand and shop detail drawings? We think so in all respects, and affirm the judgment.

On the equitable fee adjustment issue, the trial court directed a verdict for Chemico, denying any adjustment in Continental's favor. Continental did not seek relief on this issue by resort to the contract, which clearly provided for an equitable fee adjustment on the basis of *written* change orders whereby Chemico would acknowledge a material increase in the scope of the work (Article F). No *written* change orders had been made, and those which had been requested were denied by Chemico with the excuse that it was unable to secure similar relief from ARKLA. Consequently, Continental made a frontal assault on the written contract which had been executed "on" and "as of" February 2, 1966, and which contained an express merger clause.[1] The subcontractor's theory was as follows: (1) The written contract is ambiguous as to what was its effective date; (2) therefore, parol evidence is admissible to show that the August 1965 subcontract negotiations were consummated in a final, oral contract (later to be "memorialized" in writing);[2] (3) this oral agreement firmly established the project scope; and (4) all subsequent scope changes instituted orally or in writing by Chemico should be a basis for predicating an equitable fee adjustment claim, notwithstanding the subsequent written contract provision requiring express written change orders. (Article F.)

■■ The trial judge was not persuaded by Continental's theory, nor are we. The directed verdict for Chemico was correctly granted for several reasons. First, the written contract containing the express merger clause was clear, unambiguous, and subject to no more than one interpretation. *See* 3 Corbin, Contracts § 554, pp. 222–223 (1960). Therefore, it need not be opened to judicial construction, even if giving effect to its literal terms will work a hardship on one party. *See* National Surety Corp. v. Western Fire & Indemnity Co., 5 Cir., 1963, 318 F.2d 379, 387.

> "A provision of a contract, which is clear and unambiguous and not subject to more than one interpretation, is not open to construction, even if giving effect to its literal terms will work a hardship on one of the parties. The rule has been applied to insurance contracts." [Citations omitted.]

*See also* Jacksonville Terminal Co. v. Railway Exp. Agency, Inc., 5 Cir., 1961, 296 F.2d 256, 261; Simpson Timber Co. v. Palmberg Const. Co., 9 Cir., 1967, 377 F.2d 380, 386; Jackson v. Sam Finley, Inc., 5 Cir., 1966, 366 F.2d 148, 155; Florida Canada Corp. v. Union Carbide & Carbon Corp., 6 Cir., 1960, 280 F.2d 193, 196, and cases cited therein. The fact that Continental vigorously objected to the original $233,000 fixed fee on more than one occasion before execution of the written contract and that the subcontractor attempted (but failed) to secure a contemporaneous oral agreement for a post-performance equitable adjustment from Chemico indicates that the subcontractor was in the weaker bargaining position. With the trial court we agree that Continental "should have stopped right there and said we won't go one foot further until you give us a [written] change order."

Moreover, the final, oral contract theory falls of its own weight, though

1. "Article Q—Contract Entire Agreement:
   "This Contract constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, whether written or oral."

2. In support of the final, oral contract argument, Continental asserted that the parties had before them the subcontractors' detailed proposal and a draft contract (the "Plywood" contract) which was to ultimately be the written contract. Furthermore, Continental contended that Chemico's oral release to the subcontractor of a purchase order number, which was subsequently confirmed in writing, indicated a final agreement had been reached.

such infirmities are not dispositive by virtue of the operative effect of the written contract. First, Continental made the August 1965 proposal as a joint-venturer with a Dallas subcontractor who ultimately refused to become a party to the written contract. Second, the proposal was in the nature of a counteroffer since Continental and the Dallas firm had declined to bid on the original invitation and since their joint proposal significantly expanded the original project scope. Third, Continental was never able to show clearly what its "detailed proposal" actually encompassed as of the August meeting date. Fourth, Chemico successfully rebutted the claim that the "Plywood" contract was the same contract finally executed when it indicated that at least one provision of that draft contract was deleted in the final written contract and a manufacturing costs formula (not even included in the "Plywood" agreement) was inserted as a major provision of the contract. Perhaps most fatal to Continental's theory, though, is the express language of the written purchase order confirming the oral number provision which the subcontractor argued constituted conclusive evidence that a final oral agreement was reached at the August 1965 conference. A single quote therefrom clearly shows that the parties had only agreed to agree in writing at a later date after the subcontractor "formally presented a guaranteed maximum estimate for the work as described within the documents referred to as Project Scope" which were to be "submitted to Chemico for comment and/or approval." The language states, *inter alia:*

> "This Purchase Order is issued *tentatively* for the interim period *preceding the signing* of a contract for the design, engineering, procurement and construction of the materials handling system and storage buildings within the offsite portion of the ARKLA chemical complex at Helena, Arkansas." (Emphasis added.)

Because of the operative effect of the written contract and the patent infirmities in Continental's oral contract argument, we find it unnecessary to reach Continental's secondary theory that an oral construction contract later to be reduced to writing is valid in Louisiana. *But compare* Cox-Hardie Company v. Rabalais, La.App.1964, 162 So. 2d 713, *with* Breaux Brothers Const. Co. v. Associated Contractors, 1954, 226 La. 720, 77 So.2d 17, 29. *Cf.* Roy O. Martin Lumber Co. v. Saint Denis Securities Co., Inc., 1954, 225 La. 51, 72 So.2d 257, 261; West v. Carbone, La.App.1963, 150 So.2d 37, 40. As a result, a conflict of laws issue is foreclosed since the Louisiana oral contract law problem is not reached.

■ Likewise, we conclude that the trial court correctly employed the parol evidence rule.[3] While Continental may

---

**3.** *See* 3 Corbin, Contracts § 573, p. 357 (1960):

> "When two parties have made a contract and have expressed it in writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."

*See also* Anheuser-Busch, Inc. v. Jefferson Distributing Company, 5 Cir., 1965, 353 F.2d 956, 962 (an Alabama case). Furthermore, the trial judge actually permitted Continental to introduce parol evidence in his effort to help the subcontractor establish the precise pre-written contract scope which he ruled *might* be the basis for an equitable adjustment of the fee should Continental prove postcontract change orders materially changing the scope. The trial court observed:

> "The burden is on the plaintiff [Continental] to show two things here. First, that you did additional work and that the work was not within the scope of the work to be performed as provided."

The judge commented further that "the contract lends itself to parol evidence to show what the scope of the work was."

have injured itself economically when it capitulated on its demand that a pre-execution fee adjustment be made, we cannot now create for the subcontractor, by construction of the contract, a more beneficial compensation scheme than he was able to secure in an arm's-length, even if no-holds-barred, negotiation. *See* National Surety Corp.˙ v. Western Fire & Indemnity Co., 5 Cir., 1963, 318 F.2d 379, 387. The contract was undeniably effective "as of" February 1966, all prior negotiations were integrated therein, no written change orders were executed by Chemico in accord therewith, and the contract must be enforced as literally written.

There is no need for extensive elaboration on the remaining four issues before us for review since we fully agree with the trial judge's rationale and judgment. All four issues involved disputed cost items. The contract cost reimbursement provisions (Article B-1) were subcategorized by location of performance: Field Costs, Home Office Costs, and Manufacturing Costs. As to two of the cost items, overtime bonuses and job shopper overhead, the trial judge concluded that he "should have directed a verdict" for Chemico and, therefore, granted the prime contractor's motion for judgment notwithstanding the verdicts thereon. *See* Cedar Crest Hats, Inc. v. United Hatters, Cap & Mil. Wkrs. I. U., 5 Cir., 1966, 362 F.2d 322, 327; Fed.R.Civ.P. 50(b). With respect to a third controverted cost item, "detailing" or partial drawings reproduced by draftsmen from master drawings for manufacturing craftsmen, and a fourth item, cost of sand, the trial judge denied the motion for judgment notwithstanding the verdict because the evidence was conflicting as to whether such costs were properly allocable to the home office or the manufacturing reimbursement formula. *See* 3˙ Corbin, Contracts § 554, pp. 226–227 (1960).

We, therefore, adopt as our own the decision of the trial judge, rendered on the motion for judgment n. o. v. and set forth in detail in the margin of this opinion, as to the aforementioned cost issues.[4]

Affirmed.

---

Finally, he summed up Continental's situation with a rhetorical question and a ruling:

"What was the scope of the work on the day you signed the contract? You can show that for the purpose of showing this was something beyond the scope of the work."

*See* 3 Corbin, Contracts, § 579, pp. 412–431 (1960). Therefore, Continental's argument that the trial court excluded its proffered parol evidence is inaccurate. In actuality, counsel for the subcontractor recognized and identified his own dilemma when he admitted at the trial below:

"We claim it [the scope] was increased after we made the contract in August, and we also claim it was increased after we signed the contract in February, but I am frank to say to Your Honor the changes that occurred after [the] contract was signed in February are few, and relative to the over-all changes that occurred since August, they are very few. Virtually all the changes occurred in late August, and in the early fall of 1965. * * *"

4. The trial judge's order stated as to these items, the following:
"Item 4—Overtime bonuses paid employees exempt from overtime provisions of the Wage-Hour Law.
"This item purports to represent overtime charges for overtime wages and salaries plus the 90% above referred to. Such overtime salaries were not in fact paid to plaintiff's employees for work on the contract with defendant, but were put in a fund and later paid out, without relation to the work performed under the contract, in the form of year-end bonuses. Section B 2 provides for reimbursement for 'all direct salaries and wages paid by [the] Contractor to Home Office personnel * * * for time actually consumed in performing The Work.' Section 4 of paragraph B provides that the 90% shall be applicable to 'total salaries and wages chargeable to [the defendant] under sub-paragraph 2' and was to cover payroll taxes, compensation insurance, etc. and 'all other EMPLOYEE BENEFITS and overhead expenses of [the] Contractor in connection with its Home Office.' (Emphasis supplied.). It was not shown that these sums were

**994**

Opal L. THOMPSON, Plaintiff-Appellee,

v.

Emmett R. UNDERWOOD, Defendant-
Appellant.

No. 18618.

United States Court of Appeals
Sixth Circuit.

March 4, 1969.

paid pursuant to a regular schedule for the payment of bonuses. Alabama Power Co. v. Federal Power Comm., 5 Cir., 134 F.2d 602, 610.

"The Court is of the opinion that it would have to stretch the terms of the contract provisions to hold that the sums so paid were direct salaries and wages paid for time actually consumed in performing the work, and is of the opinion that a verdict for the defendant should have been directed with respect to such item."

\* \* \* \* \*

"Item 9—90% Home Office Overhead on Job Shoppers.

"This item amounts to $31,149.00 and represents the 90% provided for by paragraph B 4 on sums paid to job shoppers for extra help that plaintiff was required to engage. These parties worked at the Home Office of the plaintiff and were supervised by senior engineers of the plaintiff. Plaintiff furnished their working space and supplies, and they conformed to all of the plaintiff's rules and practices for its regular employees.

"It is a customary practice in the industry to use job shoppers in periods of peak workload.

"Defendant contends that these were not Home Office personnel as such words are defined in paragraph B and were not paid direct salaries and wages in accordance with B 2; and that these employees were obtained 'under subcontract and purchase orders' pursuant to B 1 as to which the 90% provision of B 4 is inapplicable. These employees were paid their wages and salaries and all employee benefits by the job shop company by whom they were employed. The job shop company added its profit and overhead.

"The Court is of the opinion that it should have directed a verdict for the defendant as to this item."

\* \* \* \* \*

"Item 1—Detailing.

"It will be observed that from the above quoted provision of the contract that the scope of the work includes the performance of 'necessary architectural and engineering design services, including preparation of all additional process sheets, preliminary drawings and studies and detailed plans \* \* \*' Defendant contends that this is a manufacturing cost. The plaintiff contends that this represents services of engineers and draftsmen and is an engineering cost chargeable to the job for which it should be reimbursed as a part of Home Office expense. The contract provides, C 2-Page 11, that the contractor will be reimbursed for direct shop labor at the rate of $5.20 per hour. Exhibit A defines what job classifications make up direct shop labor. It is further provided that this rate of $5.20 per hour is to cover direct labor cost, the supporting labor cost, indirect labor cost and 'all other manufacturing burdens.' Exhibit A does not include engineers or draftsmen as being in the job classification making up direct shop labor.

"In the light of conflicting evidence, the Court is of the opinion that it was for the jury to determine whether the detailing was a part of the manufacturing costs or manufacturing burden, or whether these costs were engineering costs for which the plaintiff should be reimbursed as a part of Home Office costs." ·

\* \* \* \* \*

"Item 14—Sand.

"This is one of the much controverted items and involves the sand that was

used in sandblasting steel that went into the construction. Paragraph C of the contract defines manufacturing costs 'as the costs incurred by [the] Contractor in its own manufacturing facilities for the conversion of purchased raw material into portions' of the System. The sand, of course, was used for the changing or conversion of the raw material into parts of the System.

"By the concluding sentence following the language above quoted, it is provided that 'these costs shall be limited to the following:

" '1. All amounts actually paid or incurred by Contractor under purchase orders properly let or issued by Contractor FOR RAW MATERIALS. These raw materials shall include steel, paint, AND SIMILAR MATERIAL; all to accord with approved specifications.' (Emphasis supplied.)

"Paragraph 2 provides that the rate of $5.20 per hour is 'to cover the direct labor cost, the supporting labor cost, and the indirect labor cost, and ALL OTHER MANUFACTURING BURDENS.' (Emphasis supplied.)

"Paragraph 3 provides that 15% shall be added to the items included in 1 and 2 to cover general and administrative costs, and paragraph 3 further recites that 'it is understood that purchased items listed in Exhibit B AND SIMILAR ITEMS are not to be considered manufacturing costs and are to be excluded from this 15%.' (Emphasis supplied.) Exhibit B does not contain a specific itemization of sand. It could be possible that as a 'similar item' it is included under 'material purchased in the field' and it might be excluded from such Exhibit B which includes 'other items not contributing to Contractor's general and administrative costs.' Certainly, the $66,108.00 worth of sand (including the 15% under B 3) has contributed to the contractor's general costs.

"The matter cannot be disposed of on the simple dictionary definition of 'raw materials' as being 'industrial goods which in part or in whole produce a portion of the physical product.' In finishing steel for use the cleaning is just as necessary as the painting because the paint cannot be applied until the steel is cleaned.

"When the parties defined raw material as including steel, paint and similar materials, it opened the door for someone to determine what 'similar material' is. Can this Court say as a matter of law that it does not include sand which is as essential to preparation of the steel as the paint? The Court thinks not.

"The Court is of the opinion that this item was properly submitted to the jury and should not be disturbed on this motion."