**BAGWELL COATINGS, INC.,**
**Plaintiff-Appellee,**
**Cross-Appellant,**

v.

**MIDDLE SOUTH ENERGY, INC., et al., Defendants-Appellants,**
**Cross-Appellees.**

No. 85–4326.

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1986.

---

J. Leray McNamara, Wise, Carter, Child & Caraway, Jackson, Miss., for defendants-appellants, cross-appellees.

William R. Purdy, Ott & Purdy, Jackson, Miss., for plaintiff-appellee, cross-appellant.

Before WILLIAMS, GARWOOD, and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Bagwell Coatings, Inc. (Bagwell) brought this Mississippi diversity suit against Middle South Energy, Inc. (Middle South) and Bechtel Power Corporation (Bechtel), Middle South's agent, for breach of contract. Bagwell sought damages for its increased costs allegedly resulting from breach, and interference with performance, of its contract with Middle South to fireproof steel members in a nuclear facility under construction in Mississippi. Following a five-day-bench trial, the magistrate awarded Bagwell some $280,000 in damages against Middle South for Bechtel's actions in the contract's second mobilization. The magis-

trate also held that Bechtel was not liable to Bagwell because Bechtel was the agent of Middle South, a disclosed principal. The district court adopted these findings. Middle South appeals the judgment against it, claiming that pursuant to the provisions of the contract as interpreted under Mississippi law, Bagwell was not entitled to damages, and that in any event Bagwell did not sufficiently prove the amount of its damages. Bagwell cross-appeals, claiming that it was also entitled to damages it incurred during its first mobilization under the contract, and that Bechtel should have been held liable in tort for the damages that Bagwell incurred. We affirm the judgment of the district court.

### Facts and Proceedings Below

Middle South, the owner-operator of the Grand Gulf Nuclear Station (Grand Gulf) in Claiborne County, Mississippi, hired Bechtel as its agent for procuring, scheduling, supervising, and administering the construction of this facility. In connection with the construction of the facility, Bechtel, as Middle South's agent, solicited bids for the cementitious fireproofing of the structural steel members of Grand Gulf. On August 27, 1976, Bechtel caused the structural steel fireproofing contract to be awarded to Bagwell.

Under this contract with Middle South, Bagwell was obligated to apply cementitious fireproofing to structural steel members. When applied, this type of fireproofing resembles mortar and dries into a hard, cement-like material. The contract specified the spray method of application, which uses heavy mixing equipment to pump the fireproofing material through hoses and out a spray gun or nozzle.

The contract between Middle South and Bagwell incorporates the instructions of the Carboline Company (Carboline), the manufacturer of "Pyrocrete," a product specifically approved in the contract. The contract further states that "[m]ixing and application of fireproofing material shall be in accordance with the manufacturer's published instructions." Bechtel also approved the published instructions of Carboline,

which Bagwell furnished pursuant to the contract requirement that it submit for Bechtel's approval "detailed written procedures, instructions, and drawings required to correct or install material or equipment." These published Carboline instructions state that Pyrocrete was to be "install[ed] ... after all steel is in place but before ducts, pipework, equipment, and other similar obstructions are in place."

Bagwell's trial evidence showed that it relied on these provisions regarding the absence of obstructions when it calculated its bid. The bid documents furnished by Bechtel include only civil and architectural drawings, which do not reflect any attachments to the structural steel. Testimony by persons who prepared Bagwell's bid established that Bagwell, in calculating its bid amount, relied on Bechtel's representation that fireproofing would be applied in advance of obstructing work by other trades.

Bagwell also expected to perform its work in one continuous flow. As one of its employees testified, Bagwell thought the job would be finished in a process whereby "you get in and get out, so if you have a room like this, you're fireproofing the structural steel members in it, there's no desk and no chairs, you get some rolling scaffolding and you can just roll right on through it, and when you hit that end wall you're finished and you go to the next room."

Although Bagwell based its bid on being able to fireproof structural steel by the spray method in one continuous workflow prior to the installation of any obstructions by other trades, it also made normal allowances for downtime in equipment, loss of material, and reduced labor productivity in its bid calculations. While Bagwell did take into account the necessity of moving its equipment from one plant elevation to the next, it apparently anticipated that all work would be completed on one elevation before it would have to go to another. In all, Bagwell submitted a bid on a unit price basis for $2.46 per square foot. Despite its unit price being two cents higher than the

lowest bid submitted, Bagwell received the job because Bechtel evaluated its bid to be the lowest based on price escalation factors.

Bagwell first began fireproofing under the contract in July 1977, nearly one year after it was awarded the contract (the first mobilization). Upon arriving at the job site, Bagwell found that there were some obstructions in the areas it was to fireproof, including some installed heating, ventilating, and air conditioning equipment. Bagwell asserted that it experienced further inconvenience due to Bechtel's failure to issue a smooth flow of work releases so that Bagwell could fireproof continuously. Under the contract, Bagwell was not authorized to perform work in any area unless Bechtel issued a work release.

In January 1978, approximately five months after the first mobilization began, Bagwell wrote Bechtel and requested that work be released for continuous fireproofing operations. On March 17, 1978, Bagwell notified Bechtel that all work released would be completed in a week and again requested that work areas be made available. On March 28, 1978, Bechtel responded that Bagwell's request for additional work releases was not "beneficial in terms of cost to the client [Middle South]," and, as authorized by article 42 of the contract, it ordered Bagwell to suspend all operations until further notice. Bagwell thereupon demobilized.

Bechtel, as authorized by the contract, remobilized Bagwell in August 1979 (the second mobilization). Immediately upon its return, Bagwell discovered a dramatic increase in the number of obstructions that would hinder its contractual performance. Charles Monroe, Bagwell's superintendent for the work at Grand Gulf, refused to go forward with the fireproofing work without the express authority of Luis Gonzalez, Bagwell's president. Monroe advised Gonzalez that Bagwell should not remobilize until the problem with the obstructions was clarified and resolved. Bechtel employees were present during this phone conversation between Monroe and Gonzalez, and at

least one of them implored Bagwell to continue with the work, claiming that Bechtel would "work out" additional compensation problems with Bagwell if it would begin performance. Gonzalez agreed to remobilize.

Throughout the second mobilization, Bagwell attempted to fireproof the structural steel, but its efforts were seriously hindered by the heating, ventilation, and cooling vents, electrical conduits, pipe work, and numerous other obstructions installed after the first mobilization. Congestion also impeded Bagwell's progress. Bagwell's employees had to climb over and around various obstructions in order to complete their work. There was evidence that some employees quit because of these conditions. These obstructions also prevented Bagwell from getting its mixing equipment close to the work, and Bagwell was forced to use much longer lengths of hose than recommended, an event that apparently caused some equipment breakdowns and higher maintenance costs. Bechtel admitted that the decision to place obstructions on the steel in advance of fireproofing and Bechtel's lack of work releases hampered Bagwell's performance and increased its costs, although the amount of the increase is disputed. On September 24, 1979, shortly after Bagwell's second mobilization began, Bechtel published a construction cost Trend Report No. 41. This report assigned $340,000 as an allowance for increases in costs for extra work claims due to interference or congestion, of which approximately $80,000 was assigned to go to Bagwell for related work under this contract.

Both Bagwell and Bechtel maintained detailed records on a daily basis of Bagwell's labor and material expenditures, and there is no dispute as to their accuracy. These records reflect the names of Bagwell's personnel, their hours of work, where they worked, the type of work, and the quantity of material applied and the type of equipment employed.

Once Bagwell realized that its performance would be impaired by various physical

obstructions, it attempted to negotiate a higher price to compensate for its increased costs. Bagwell first attempted to notify Bechtel of its desire for additional compensation in the interim between mobilizations in which Gonzalez advised Bechtel that there needed to be some discussion of pricing. Upon remobilization, Bagwell repeatedly requested revised rates. Bagwell asked Bechtel first to increase the unit price of the contract, then to approve cost-plus compensation, and then to agree to a combination of the two. Bechtel consistently refused to increase the price specified in the contract. Bagwell furnished to Bechtel numerous cost breakdowns and formally requested a contract amendment. The district court held, however, that since Bechtel never refused a claim by Bagwell because it was untimely filed under the contract, it waived the right to this requirement. Lastly, when Bechtel became interested in using a different fireproofing material, Bagwell apparently attempted to recoup some of its costs and quoted a price based on congested conditions and its previous losses.

Despite Bechtel's previous assurances that it would work out its cost problems with Bagwell, Bechtel, as the district court put it, "haggled over minutia." Although article 38 of the contract between Bagwell and Middle South provides for payment under some circumstances for "changes and extra work," Bechtel refused to authorize additional compensation to Bagwell under this clause. The district court found that Bagwell attempted to file a "timely and adequate claim for additional compensation as provided for by the terms of the contract." Bechtel's response to these requests for additional compensation, however, was to disallow them because of alleged documentation inadequacies.

After deciding to use a different fireproofing material, Bechtel rejected all of Bagwell's subsequent proposals to finish the work, the last of which were quotes for $14.82 and $9 per square foot, depending on the material used. One month after these proposals were made, Bechtel exercised the optional termination provisions of the contract and cancelled the remaining portion of Bagwell's contract for the express reason that Bagwell's proposed prices were too high. Bechtel completed the fireproofing work with its own employees at an average cost of $22 per square foot. Following its termination, Bagwell continued to submit claims for reimbursement of its extra costs caused by obstructions and scheduling difficulties, and it also submitted claims under the termination clause. The claims under the termination clause were settled and Bagwell reserved its rights to claims for additional compensation for its increased costs due to the changed job conditions and Bechtel's lack of scheduling coordination. Bagwell subsequently filed suit against Middle South and Bechtel seeking to recover these amounts.

### Discussion

### I. *Damages for Second Mobilization*

The district court awarded Bagwell damages for the second mobilization only, and Middle South claims on appeal that the district court erred in making this award for various legal and factual infirmities. Middle South asserts that the district court erred in refusing to find that the remedial provisions of the contract between Middle South and Bagwell were dispositive of any claim by Bagwell for additional compensation. Middle South also claims that Bagwell waived its breach of contract action by its continued performance. Finally, Middle South claims that in any event the district court erred in awarding Bagwell damages because Bagwell failed to introduce sufficient evidence that Bechtel's actions were the proximate cause of any specific damage incurred by Bagwell.

### A. *Entitlement to Breach of Contract Damages*

 The contract between Middle South and Bagwell contains an explicit provision for "changes and extra work."[1] This provision, article 38, essentially allowed Bechtel, as Middle South's agent, to

---

**1.** This portion of the contract provides, in perti- nent part:

require Bagwell to perform "extra work," work outside the scope of the contract, or a "change," a substitution, addition, or deletion of work within the scope of the contract. To be recompensed for changes or extra work, Bagwell was required to submit within ten days after receiving a written order from Bechtel a proposal outlining the cost of such work in sufficient detail, which Bechtel could either accept or reject in whole or part. If this proposal was rejected in whole or in part by Bechtel or if Bagwell did not submit a cost proposal, article 38 provided a detailed method of computing compensation. It is the asserted applicability of article 38 to the facts of this case that is the main focus of Middle South's appeal.

Middle South claims that article 38 should have governed the district court's disposition in this case. First, Middle

South notes that the district court held that under the circumstances before it, Bagwell had "the right ... to submit a claim for additional costs," thus arguably finding article 38 applicable. Middle South claims that the district court ignored its own holding by finding that the conditions Bagwell faced during its second mobilization were "the proximate cause of substantial additional costs to plaintiff [Bagwell] in continuing work at Grand Gulf," but nevertheless awarding damages not in accordance with article 38. Since the district court awarded damages to Bagwell other than pursuant to article 38, Middle South concludes that the district court implicitly but erroneously awarded damages for breach of contract. Thus Middle South's ultimate position is that Bagwell must recover additional compensation, if any is owing, only through article 38.

"38. CHANGES AND EXTRA WORK: The term 'Change,' as used in the Subcontract, means substitutions, additions, or deletions within the scope of the Subcontract. The term 'Extra Work,' as used in the Subcontract, means work outside the scope of the Subcontract.

"Contractor [Middle South, through Bechtel] may, at any time, without invalidating the Subcontract and without notice to the sureties, if any, make Changes and may request Subcontractor [Bagwell] to perform Extra Work.

"Contractor will issue written orders to Subcontractor for any Changes or Extra Work, provided that in the event of an emergency which Contractor determines endangers life or property, Contractor will issue oral orders to Subcontractor for any work required by reason of such emergency. Such orders will be confirmed in writing as soon as practicable. Such orders, whether written or oral, may be accompanied by drawings and data as are necessary to show the extent of such ordered work.

"Subcontractor shall commence such work so that all the dates set forth in Subcontractor's current construction schedule as approved by Contractor will be met, provided that in the event of an emergency which Contractor determines endangers life or property, Subcontractor shall commence such work as required by Contractor. Failure to commence any such work in timely fashion shall entitle Contractor to invoke the provisions of the GENERAL CONDITIONS article entitled TERMINATION FOR DEFAULT.

"Unless otherwise required, Subcontractor shall, within ten calendar days following receipt of such written orders, submit in writing to Contractor a proposal for accomplishing such work, which proposal shall reflect the increase or decrease, if any, in cost to Subcontractor of performing work under the Subcontract in comparison to what the cost would have been, had such work not been ordered. The proposal shall state the basis of compensation for the work involved in the Change or Extra Work, or if the change causes a decrease in the cost of performing work under the Subcontract, the amount of such decrease shall be stated. Sufficient detail shall be given in the proposal to permit thorough analysis of the proposal. The basis for compensation shall be either:

"(a) Subcontract unit or lump sum prices, if applicable.

"(b) New unit or lump sum prices.

"If Subcontractor does not propose the method of compensation for such work or any part thereof, or if any proposed method is not acceptable or if a method of compensation for such work, or any part thereof cannot be agreed upon, Subcontractor shall proceed with such work and compensation therefor will be made on a cost-plus basis as set forth in Paragraphs (i) through (v) below. If at any time after Subcontractor commences such work, a method of compensation other than cost-plus therefor or any part thereof has been agreed upon, such compensation will be made in accordance with such agreement. In any event Subcontractor shall keep accurate records of the actual cost to Subcontractor for such work."

Middle South asserts that the contract is flexible and is fully capable of resolving the current dispute through its various provisions and amendments, including primarily article 38 for "changes and extra work." Middle South claims that the contract also provides compensation for "differing site conditions" (article 16),[2] and "suspensions" (article 42),[3], and thus concludes that the contract is fully capable of adapting to meet this dispute. However, Middle South fails to explain why article 38 or any of the other above-noted articles are applicable to this particular dispute. Middle South claims that under article 38 Bagwell forfeited all rights to additional compensation because Bagwell did not comply with the requisites contained therein for compensation. Middle South asserts that Bagwell submitted claims under article 38 that were no more than "stacks of paper," and thus Bechtel's rejection of these claims was correct. We reject these contentions.

Bagwell's suit was for breach of contract by Middle South. Bechtel, Middle South's agent, violated a specific contractual condition that it not obstruct the structural steel before the fireproofing. The contract between Middle South and Bagwell provided, through the adoption of Carboline's guidelines for the use of its cementitious fireproofing material Pyrocrete, that the fireproofing work was to proceed before instal-

lation of fixtures or equipment obstructing access to the steel members. This was a specific contract provision, unique to the contractual relationship between these parties.[4]

Breach of this contractual provision to provide Bagwell unobstructed access to the structural steel is fully supported by convincing, undisputed evidence in the record. Don Williams, the production foreman for Bagwell during the Grand Gulf project, testified that "piping, unistruts, duct work, [and] cabletrans" were attached to the structural steel, and these obstructions "slowed it [the fireproofing] down an awful lot." Photographs were admitted into evidence that established the work surface area in and around structural steel was clustered with various components. Williams also testified that conditions were often even more congested than those depicted in the photographs. These photographs show steel covered with various ducts and other obstructions. Working conditions suffered greatly as a result of this congestion, and workers were forced to improvise to the extent possible.[5] Furthermore, Gonzalez, president of Bagwell, testified that "not having control of the work, the congestion, and not having a proper schedule" severely affected Bagwell's profitability under its contract with

---

2. Article 16, despite its title, is clearly inapplicable to this dispute, for it provides relief only for "subsurface or latent physical conditions" or "unknown physical conditions." Neither party seriously contends that either of these clauses governs the instant dispute.

3. Article 42 is also inapplicable, for the compensation awarded under this article is for damages due to the suspension. Article 42(b) states, "As full compensation for such suspension Subcontractor [Bagwell] shall be reimbursed ... [specified] costs, reasonably incurred, without duplication of any item, to the extent that such costs directly result from suspension of work...." The damages Bagwell sought in filing this suit were for damages incurred prior to the suspension.

4. We note that article 35 of this contract, entitled "Cooperation with Others," provides that Bagwell was subject to interference by other subcontractors as a result of concurrent activi-

ties because "Contractor reserves the right to require Subcontractor to schedule the order of performance of its work in such manner as will minimize interference with the work of any of the parties involved." In Mississippi, where there are conflicting general and specific contract provisions, the specific provisions control. *See Forbes v. Columbia Pulp and Paper Company, Inc.,* 275 So.2d 92, 95 (Miss.1973). Article 35 was hence subordinate to the provision prohibiting obstruction of the steel members.

5. During direct examination, Gonzalez noted the frustration he felt as his employees tried to cope with the obstructions. He testified that

"[w]e were actually taking material with our hands and applying it to holes instead of a spraying or troweling. There were areas where it was totally inaccessible. People just couldn't get in there. We had meetings with a business agent to try to provide us smaller people. He kept on saying, 'Bring them from Baton Rouge; I don't have midgets here.'"

Middle South. Thus we find uncontroverted evidence in the record that Middle South, through its agent Bechtel, breached its contract with Bagwell.[6]

As we have noted, the contract requires that the fireproofing was to be done before the ducts, pipework, equipment, and other similar obstructions were in place. While it is perhaps arguable that "Changes" or "Extra Work" within the contemplation of article 38 should not be read so broadly as to authorize total repeal of this provision against obstruction of access,[7] we need not resolve that issue. Here, article 38 was never invoked by Bechtel or Middle South so as to alter this provision of the contract. No written order for "Changes" or "Extra Work" was ever issued in this respect,[8] and indeed Bechtel consistently refused to issue such an order. Accordingly, article 38 never came into play, and there was no article 38 "Change" of the contract to eliminate the provision prohibiting obstruction of access to the steel members.[9] Consequently, Middle South's breach of the contract remained unexcused.[10] The cases relied on by Middle South[11] are not in point, for none of them involve situations where the party in Middle South's position was guilty of breach of the contract. Moreover, here, Bagwell's recovery is for damages for breach of contract, as opposed to being for the value of work not covered by the contract. Bagwell performed the work covered by the contract—fireproofing the structural steel—and has not recovered for performing work not covered by the contract. Rather, Bagwell has recovered damages it incurred because Middle South's breach of the contract provision prohibiting obstruction of access increased Bagwell's cost of performance. Nor is this a situation in which a contractually authorized change order is issued. *See Jackson v. Sam Finley, Inc.*, 366 F.2d 148 (5th Cir.1966). Had such an order been properly issued under article 38 (assuming its potential applicability), then Bagwell would have been entitled to the additional compensation called for by article 38 (in contrast to the *Sam Finley* situation where under the contract the change order did not affect the unit price), and the contract would have been changed so that Middle South would not have been in breach of it. But a change order was

6. In this context, we also note that interference of contractual performance is a breach of contract. *See, e.g., United States v. Klingensmith, Inc.*, 670 F.2d 1227, 1230 (D.C.Cir.1982). In *Citizens National Bank of Orlando v. Vitt*, 367 F.2d 541, 545 (5th Cir.1966), we stated, "Wherever the cooperation of a promisee is necessary for the performance of a contract, there is an implied condition of the contract that the cooperation will be given." Here the case for recovery is stronger, for there is a breach of a specific contractual provision as to the appropriate working conditions for performance of the fireproofing work.

7. *See Westinghouse Electric Corp. v. Garrett Corp.*, 437 F.Supp. 1301, 1332 (D.C.Md.1977), *aff'd*, 601 F.2d 155 (4th Cir.1979). *But see Litton Systems, Inc. v. Frigitemp*, 613 F.Supp. 1377, 1383 (S.D.Miss.1985).

8. Nor was there any emergency determined by Middle South or Bechtel to endanger life or property on the basis of which any oral change order was issued as required by the emergency, nor any written confirmation of any such oral order.

9. Had there been such a change order, and assuming article 38 was available for the purpose, Bagwell would have been entitled to compensation under article 38.

10. *See also North Harris County Jr. College v. Fleetwood Construction Co.*, 604 S.W.2d 247, 254 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.):

"The trial court found that Fleetwood gave adequate notice of the changes in the work required by the discovery of the concealed condition and that the College failed to issue a change order or to order a change in the specifications which would accommodate the saturated condition. These findings are well supported by the evidence.

"We hold that the College breached the contract and thereby relinquished its procedural rights concerning change orders and claims for additional costs when it refused to acknowledge the 'concealed condition.'"

11. *Citizens National Bank of Meridian v. L.L. Glascock, Inc.*, 243 So.2d 67 (Miss.1971); *Delta Construction Co. of Jackson v. City of Jackson*, 198 So.2d 592 (Miss.1967); *Jackson v. Sam Finley, Inc.*, 366 F.2d 148 (5th Cir.1966); *Chemical Construction Corp. v. Continental Engineering, Ltd.*, 407 F.2d 989 (5th Cir.1969).

not issued, so Middle South remained in breach of its obligations under the contract. Bagwell, which performed its obligations, is entitled to recover its damages for Middle South's breach.[12]

■ Nor does Middle South fare any better under its waiver or election of remedies contentions urged at oral argument before us. Middle South's theory seems to be that remedies under article 38 and for breach of contract are mutually exclusive, and that by continuing performance Bagwell chose the former and waived the latter. Under Mississippi law, election of remedies applies only when there is a choice between two or more available but inconsistent remedies. *Anaconda Aluminum Co. v. Sharp*, 136 So.2d 585, 588 (Miss.1962); *O'Briant v. Hull*, 208 So.2d 784, 786 (Miss. 1968). Mississippi "has been slow to accept the doctrine of election of remedies" and its application "has been carefully limited and guarded." *Anaconda*, 136 So.2d at 589. Election has not been established here. Since a change order was not issued, and Bagwell had no right to force a change order as such, an article 38 remedy was not available. Bagwell made no "choice" between article 38 remedies and those for breach of contract. Bagwell, at the beginning of the second mobilization, indicated it was ready to forego completely any further contract performance unless pricing arrangements were made. Bechtel pleaded with Bagwell to continue and assured Bagwell that these problems would be resolved, and that appropriate compensation would be forthcoming, if Bagwell would only return to or continue its fireproofing work. Moreover, the evidence does not indicate that while Bechtel was promising to recompense Bagwell, it promised to do so only under article 38. Indeed, the opposite appears to be true, for Bechtel employees consistently denied the applicability of any specific provision of the contract to its

dispute with Bagwell. Moreover, since Bagwell clearly protested and Bechtel induced it to nevertheless continue work by assurances that Bagwell would be appropriately compensated, it cannot be said that Bagwell's continued performance under those circumstances constituted, as a matter of law, a waiver of its right to damages for Middle South's breach of contract. *See Montgomery v. Kimbrough Homes*, 214 Miss. 519, 59 So.2d 273, 276 (1952); *Peter Kiewit Sons' Co. v. Summit Construction Co.*, 422 F.2d 242, 259 (8th Cir.1969). *See also* 13 Am.Jur.2d *Building and Construction Contracts* § 53 at 57 ("It is generally held that a building or construction contractor does not, by proceeding with the work, waive the right to recover damages resulting from the delay caused by a default of the contractee, especially where the contractor protests against the delay." (Footnote omitted.)).[13]

Finally, our holding that Bagwell is entitled to breach of contract damages apart from article 38, and that its continued performance of the work does not require a determination that it waived its right to damages, is fully supported by our recent decision in *Affholder, Inc. v. Southern Rock, Inc.*, 736 F.2d 1007 (5th Cir.1984), which also involved Mississippi law. Indeed, Chief Judge Clark's dissent in *Affholder* makes it clear that he too would have allowed recovery for the party in Bagwell's position had the work site change which caused that party's additional expenses been a breach of the contract by the other party. *Id.* at 1017. Here, as we have noted, Middle South breached the contract prohibition of obstructing access to the steel members, and article 38 does not excuse this breach because a change order was never issued. Unlike the subcontractor in *Affholder* (*id.* at 1018), Bagwell protested this breach, and Bechtel in response

---

**12.** Because article 38 did not come into play, Bagwell's damages are not limited by its provisions.

**13.** Middle South's reliance on *Chemical Construction Corp. v. Continental Engineering, Ltd.,*

407 F.2d 989, 991 (5th Cir.1969), is misplaced. That case involved neither breach of contract nor waiver, but rather an issue of contract formation.

gave assurances that Bagwell would be appropriately compensated if it continued.

### B. *Proof of Damages*

Middle South's next claim is that even if Bechtel breached the contract by obstructing the structural steel, Bagwell was nevertheless not entitled to damages because it failed to sufficiently prove that Bechtel's actions caused any specific damage, or the amount thereof. Middle South asserts that the district court adopted a "total cost" method of calculating Bagwell's damages, which erroneously permitted Bagwell to assume that Bechtel's breach caused all the additional costs which Bagwell thereafter incurred. Consequently, Middle South asserts, the district court did not require Bagwell to, and Bagwell did not, prove that its own internal inefficiencies or other problems not related to Bechtel or Middle South were not in whole or part the cause of Bagwell's increased costs, and thus Bagwell failed to meet its burden of proof. *United States ex rel Gray-Bar Electric Co. v. J.H. Copeland & Sons, Inc.*, 568 F.2d 1159, 1161–62 (5th Cir.), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3072, 57 L.Ed.2d 1123 (1978) ("[T]he party who seeks to collect damages has the burden of proving the extra costs it has incurred as a result of the breach.").

As Middle South notes, the "total cost" method is not well defined, but it typically involves a comparison of the bid amount and actual costs. It has been described as follows:

"The total cost method for ascertaining damages 'has been used when actual costs for the change are unavailable and there is no acceptable estimate of the costs involved in the change. Under this method, the contract price is subtracted from the total cost of performance and the difference is considered the amount of the change.'" *United States v. R.M. Wells Co., Inc.*, 497 F.Supp. 541, 545

(S.D.Ga.1980) (quoting Nash and Cibinic, *The Changes Clause in Federal Construction Contracts*, 5 Geo.Wash.L.Rev. 908, 933 (1967)).

Here the district court derived Bagwell's "extra costs" from an exhibit Bagwell prepared that compared actual costs and estimated costs and in various cost management categories defined the difference. The district court added up the additional amounts Bagwell had expended and arrived at a total sum for Bagwell's extra direct costs. It subtracted from this amount ten percent for Bagwell's admitted internal inefficiencies. This appears to be a species or variant of the total cost approach, for often that method is modified to include a downward adjustment to eliminate costs not due to the breach.[14] *See Fattore Company, Inc. v. Metropolitan Sewerage, Inc.*, 505 F.2d 1 (7th Cir.1974).

Whatever the label of the award of damages to Bagwell, Middle South claims that the district court abused its discretion in awarding Bagwell damages on this cost comparison theory because the ten percent reduction in actual enhanced costs used by Bagwell and the district court to compute damages was not a permissible substitute for direct proof of the amount of damages where such proof was possible, as Middle South contends it was here. It asserts that the testimony of Nathan Sadownik, Bechtel's cost and scheduling supervisor, clearly established that more precise proof of damages was possible in this case when he testified that a method of attribution of damages would have been "difficult but not impossible." Middle South argues in this connection that jurisdictions utilizing the total cost method have held that in order for it to apply the claimant must demonstrate that, *inter alia*, "the nature of the particular losses makes it impossible or highly impractical to determine them with a reasonable degree of accuracy" and

**14.** We note that although the Mississippi Supreme Court has never specifically adopted the total cost approach by name, it does allow flexibility in the approximation of damage. *See Koehring v. Hyde Construction Co.*, 254 Miss. 214, 178 So.2d 838, 853 (1965). In *Affholder*, we affirmed an award of damages that was apparently based on a total cost approach, although we did not specifically describe it as such. *Id.*, 736 F.2d at 1014.

that "it [the claimant] was not responsible for the added expenses." *Wells,* 497 F.Supp. at 545; *see also J.D. Hedin Construction Co. v. United States,* 347 F.2d 235, 171 Ct.Cl. 70 (1965); *Moorhead Construction Co. v. City of Grand Forks,* 508 F.2d 1008 (8th Cir.1975). Accordingly, Middle South asserts, the entire award of damages is erroneous, and Bagwell is entitled to no recovery.

We find, however, that Middle South's position gives insufficient weight to the distinction between the amount of proof necessary to establish that a breach of contract is the proximate cause of some substantial damage of a particular kind to a plaintiff, and the quantum of proof necessary to fix the amount of those damages. A noted treatise has stated on this subject:

"An attempt is sometimes made to distinguish between certainty that some damage has been caused, and certainty as to the amount of damage; ... but no broad statement can be made that where it is uncertain that any damage has been caused by the breach no recovery is allowable.... What can be said is that—

"'There is a clear distinction between the measure of proof necessary to establish the fact that [the plaintiff] sustained some damage and the measure of proof necessary to enable the jury to fix the amount.'" 11 *Williston on. Contracts* § 1346 at 240–41 (3d ed. 1968) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (damages under Sherman Act)).

This is also the rule in Mississippi. In *Ross v. Deposit Guaranty National Bank of Jackson, Mississippi,* 400 F.Supp. 45, 52 (S.D.Miss.1974), applying Mississippi law, the district court noted this distinction, holding:

"Not only is there an absence of evidence that the plaintiffs suffered damages as a direct and proximate result of any fraudulent or tortuous action or inaction on the part of the defendants but plaintiffs failed to actually prove that they suffered any damages or the amount there-

of. Although under Mississippi Law the lack of a perfect measure of damages does not preclude recovery, nonetheless they must be proved with reasonable certainty and may not be speculative or conjectural."

 Here, as discussed previously, the evidence clearly established a breach of contract which proximately caused Bagwell to incur damages in the form of substantially increased costs of performance. For instance, Bechtel's own Trend Report No. 41 assigned $340,000 as an allowance for Grand Gulf fireproofing because of extra work claims or revised unit pricing due to interference and congestion. According to the testimony of Bechtel's employee-expert Sadownik, $80,000 of this sum was assigned to Bagwell for work related to the present contract. Sadownik also admitted that "the more obstructions that are placed on steel to be fireproofed, the more time consuming and costly" the fireproofing operation becomes. He further testified that he could quantify ten percent of excess labor and man-hour costs as due to Bagwell's internal problems in those areas since he had data on those items, but that he could not quantify other areas because of a lack of data. However, there is no indication in the record that any other problems attributable to Bagwell that were not included in the overall ten percent cost reduction even existed, much less comprised any material aspect of the other (nonman-hour or nonlabor) extra costs incurred. We note that Sadownik testified that he quantified all of Bagwell's unproductive labor that he could "without making some rash assumptions." Consequently, both the Trend Report and the testimony of Bechtel's own employee clearly acknowledged that Middle South's breach of contract in fact caused Bagwell to suffer substantial increased costs of performance.

Middle South's claim that Bagwell should be denied all damages because it did not establish that Bechtel's actions damaged Bagwell, on an item-by-item basis, must fail. This contention goes only to the amount of damages. Under Mississippi

law, where, as here, a breach is proved and causation of some substantial damage is established, the proof needed to sustain an award of damages is much more flexible. The Mississippi Supreme Court has held:

"Although the method used in obtaining the measure of damages is not entirely without fault, it may be said, as a general rule, that a party who has broken his contract will not be permitted to escape liability because of the lack of a perfect measure of damages caused by his breach. Therefore, a reasonable basis for computation and the best evidence which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of loss is sufficient proof."

*Koehring Co. v. Hyde Construction Co.,* 254 Miss. 214, 178 So.2d 838, 853 (1965). Given the difficulty of precision in proof in this regard, a difficulty established by Bechtel's own witness, Bagwell's deduction of ten percent of all its enhanced costs for its own actions, which was at least partially validated by a Bechtel witness, and the total lack of proof that Bagwell's damage calculations were incorrect, we hold that the district court's finding of the amount of damages is not clearly erroneous. *See Affholder.*[15] We reject Middle South's complaints as to the damages.

## II. *Bechtel's Tort Liability*

On cross-appeal, Bagwell claims that the district court erred in failing to find that Bechtel was liable to Bagwell in tort for Bagwell's damages. The district court held that Middle South, as Bechtel's principal, was solely liable for the entire amount of damages awarded Bagwell. While Bagwell concedes that Bechtel has no liability to it under the contract as an agent for a disclosed principal, *see Shemper v. Hancock Bank,* 206 Miss. 775, 40 So.2d 742 (1949), Bagwell nevertheless claims Bechtel is liable to it in tort. Bagwell argues that in the contract between Middle South and Bechtel, Bechtel "assumed the traditionally separate roles of architect, engineer, construction manager, and general contractor," and that under Mississippi law these persons owed a duty to third parties, including subcontractors, to perform their duties nonnegligently.

Under its contract with Middle South, Bechtel was given wide-ranging powers to act on behalf of Middle South.[16] Moreover,

---

**15.** In *Affholder* we held in affirming the district court's award of damages that:

"While it [district court] did not discuss the amount of damages, it found, 'As a result of the substantially different conditions, Affholder was required to expend the additional sums of money which it proved at trial.' Affholder introduced evidence of the retail price of the material used and the actual cost of the work performed, including overhead and profit. Kuhlmann testified in detail about the costs Affholder incurred in constructing the tunnel. Southern Rock had ample opportunity to cross-examine Affholder's witnesses concerning this evidence. Although not compelling, the evidence was sufficient to support the award." *Affholder,* 736 F.2d at 1014.

**16.** The contract between Middle South and Bechtel provides, in pertinent part, with respect to Bechtel's duties under its contract:

"ARTICLE II SERVICES TO BE PERFORMED BY BECHTEL

"Bechtel shall perform or cause to be performed for the Project the services and items described below (the "Services"):

"A. *Engineering*

"Bechtel shall perform engineering and quality assurance services, including preparation of mechanical, electrical and civil/structural designs, plans, specifications, logic diagrams, instruction books, drawings, bills of material, schedules and estimates, all as indicated by Owner to properly describe and detail the Project.

". . . .

"B. *Procurement*

"As Owner's agent, Bechtel shall procure, with the exception of the nuclear steam supply systems, nuclear fuel and turbine generators, all materials, machinery, apparatus and supplies required for permanent and temporary construction. . . .

". . . .

"With respect to the nuclear steam supply systems and turbine generators, Owner shall assign the administration of its agreements with the vendors and shall provide in connection with such agreements that Bechtel shall have the authorization to act on behalf of Owner for purposes of administration.

"C. *Construction*

"Bechtel shall be responsible for the construction of the Project and shall furnish as necessary for the performance of its construction Services, all construction facilities, construction labor and supervision, construction

Bechtel was expressly described as Middle South's agent in the fireproofing contract between Middle South and Bagwell.[17] With respect to the fireproofing contract, Bechtel prepared the specifications, accepted bids on the job, and authorized payment under the resulting contract. Bagwell claims that Bechtel actually exercised architect and engineer functions in its actions respecting the fireproofing contract.

In some instances, Mississippi has held architects and engineers liable to third parties for their negligent acts or omissions. *See State ex rel. National Surety Corp. v. Malvaney*, 221 Miss. 190, 72 So.2d 424 (1954); *see also Mayor v. Clark-Dietz and Associates—Engineers, Inc.*, 550 F.Supp. 610 (N.D.Miss.1982); *Nims v. Frady*, 461 F.Supp. 736 (N.D.Miss.1978); *Owen v. Dodd*, 431 F.Supp. 1239 (N.D.Miss.1977). In *Malvaney*, the Mississippi Supreme Court stated:

> "The architect, by his contract with the trustees, assumed the obligation to supervise the performance of the contract and to preserve the retainage funds to insure the completion of the contract, and it was apparent that his failure to exercise due care and diligence to ascertain if there were outstanding bills for labor and material before approving the release of the retainage funds might result in loss to the surety by depriving it of its rights under the doctrine of subrogation to resort to such funds upon the default of the contractor. The architect, therefore, undertook the performance of

an act which, it was apparent, if negligently done would result in loss to the surety, and the law imposed upon him the duty to exercise due care to avoid such loss." *Malvaney*, 72 So.2d at 431.

In a related context concerning the tort liability of agents to third parties under Mississippi law, we held:

> "Stanley [a contractor] thus became the agent of Callon insofar as Callon chose to fulfill its obligation under the contract to prepare a drill site. If Stanley, in fact, acted incompetently or recklessly or even negligently in preparing the drill site at an incorrect location, then, under his contract with Callon, Stanley might be liable." *Callon Petroleum Co. v. Big Chief Drilling Co.*, 548 F.2d 1174, 1179 (5th Cir.1977).

Thus under Mississippi law, architects, engineers, and possibly others who act as agents are not immune to third-party suits in tort.[18]

It appears to us, however, that under Mississippi law the liability of an architect or an engineer to a third party in this type of case depends on there being a breach of the duty owed by the architect or engineer to his principal or employer, generally the owner or developer of the project being constructed. At least this would seem to be so where, as here, the damages sought are for economic losses of the same general type as contract or quasi-contract damages (as opposed to damages for physical harm to persons or property) and there is no

---

equipment, tools and supplies. Bechtel shall receive, unload, and handle, warehouse materials, supplies, machinery and equipment required for permanent and temporary construction. Bechtel shall prepare budgets, cash flow tabulations, schedules and estimates, and perform necessary field engineering, field procurement, field expediting, and field inspection. Bechtel shall perform quality control and quality assurance functions. The Services shall be performed in compliance with the plans and specifications agreed to by Owner and all drawings issued in connection therewith. Bechtel may subcontract certain portions of the Services subject to Owner's concurrence."

**17.** The contract between Middle South and Bagwell carries the notation that: "Middle South

Energy, Inc. ('Owner') has appointed Bechtel Power Corporation ('Bechtel') to act as its Agent in awarding contracts for the Grand Gulf Project."

**18.** We note that as far as the preparation of plans is concerned, an architect is generally regarded as an independent contractor; he is an agent for the owner when he is engaged in the supervision of the construction of a building. 5 Am.Jur.2d *Architects* § 6 at 668 (1962). We observe that liability in the cases noted above does not expressly turn on the agency status of the defendant, although the courts generally seem to be more willing to hold an architect liable in defective design cases.

third-party beneficiary of the architect's or engineer's contract with the owner nor any special factor establishing on the part of the architect or engineer any duty other than that owed under or arising from his contract with the owner.[19] A district court, interpreting Mississippi law, aptly articulated this concept:

> "Because of this contractual obligation to the owner, the architect owes a further duty, sounding in tort, to the contractor who relies upon the design to his economic detriment. *Owen v. Dodd,* 431 F.Supp. 1239, 1242 (N.D.Miss.1977); *see Engle Acoustic & Tile, Inc. v. Grenfell,* 223 So.2d 613 (Miss.1969). Prosser succinctly described the relationship as follows:
>
> "[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.
>
> "W. Prosser, Handbook of The Law of Torts, § 93, p. 622 (4th ed. 1971). Accordingly, by breach of its contractual duty to the City to provide an adequate

levee and bridge design, Clark-Dietz breached a tort duty to Basic and is liable to Basic for the extra construction expenses proximately caused by the negligent design." *Mayor and City Council of Columbus, Mississippi v. Clark-Dietz and Associates—Engineers, Inc.,* 550 F.Supp. 610, 624 (N.D.Miss.1982).[20]

We find that on the facts of this case Bagwell has not established a breach *by Bechtel to Middle South.* Bagwell accuses Bechtel of violating Bechtel's obligation to Middle South "to perform its services in accordance with good engineering and construction practices." Bagwell's brief lists the following as breaches by Bechtel to Middle South of this obligation:

> "Bechtel did not permit Bagwell to perform its fireproofing work in advance of the placement of obstructions by other trades, as was represented in the bid documents and prebid meetings.... Bechtel did not schedule Bagwell's work sufficiently in advance so as to enable Bagwell effectively and efficiently to organize and plan its work.
>
> "....
>
> "... [R]ather than address the merits of Bagwell's claim, Bechtel 'consistently haggled over minutia while assuring Bagwell that it would be fairly compensated.'" (Quoting the district court's opinion.)

---

**19.** We observe that the evidence does not indicate, let alone conclusively establish, that Bechtel, in performing its complained of actions, was supposed to be functioning in an independent role in the nature of being an arbitrator between the owner and the contractor. Rather, for virtually all purposes respecting the construction, Bechtel was the owner's agent and alter ego, and its role was clearly to act *for* the owner, indeed *as* the owner, across the board; the owner, in practical effect, simply disappeared, and Bechtel took its place for purposes of effectuating the construction. Bechtel's duties are hence even more clearly limited to those owed its principal than would be the duties of an independent architect or engineer whose role in a particular instance might be to mediate or arbitrate between the owner and contractor.

**20.** Both *Malvaney* and *Clark-Dietz* concerned public contracts. In *Engle Acoustic & Tile, Inc. v. Grenfell,* 223 So.2d 613 (Miss.1969), there is a

suggestion that the liability imposed in *Malvaney* was not meant to be sweeping. The Mississippi Supreme Court stated in *Engle:*

> "The present contract is not of a public nature, but rather is a private contract between individuals and a partnership wherein no bond or retainage was required. The link in the *Malvaney* case creating the interdependent contractual duties was the surety bond required by law. No bond was required in this contract, and in its absence we think that no interdependent duties arise by implication of law. It is our opinion, therefore, that this case is not authority for enlarging the contract beyond its express terms." *Id.* at 617. Thus, although we do not decide the issue, Mississippi law may be more restrictive as to the liability of architects or engineers in a private contractual setting. *But see Owen v. Dodd,* 431 F.Supp. 1239 (N.D.Miss.1977).

While Bagwell may have suffered adverse effects from these managerial decisions by Bechtel, such adverse consequences to Bagwell do not establish a breach by Bechtel of its contract with Middle South or of any duty to Middle South arising therefrom. Nor is it established that Middle South did not in fact profit from Bechtel's decisions, even considering the damages for which Middle South is liable to Bagwell. On a huge, complicated construction project such as Grand Gulf, with many different subcontractors working, the owner may reasonably determine that the project as a whole will be completed faster and at substantially less overall cost if it changes the scheduling agreed on with one or more subcontractors, *notwithstanding* that the owner will ultimately have to bear the thus increased costs of one of the subcontractors. The latter costs may be far less than the total savings to the owner arising from the change. If the owner can reasonably so determine, then so can the party it has charged with acting in its stead and for its interests with respect to the project. Indeed, such a representative may have a *duty* to the owner to take just such action on its behalf.[21] Bagwell has presented no substantial evidence of a breach of duty by Bechtel to Middle South, nor has it demonstrated any ultimate harm suffered by Middle South as a result of Bechtel's complained of actions. Having failed to establish a breach by Bechtel of a duty to Middle South, Bagwell cannot recover from Bechtel in tort. We decline to reverse the denial of such recovery.

### III. *First Mobilization Damages*

Bagwell's final claim on cross-appeal is that the district court erred in refusing to award it damages that it allegedly incurred during the first mobilization.

We hold, however, that the district court's factual determination that the conditions Bagwell faced during the first mobilization did not merit damages is not clearly erroneous. First, we note that Bagwell made no timely submission of a claim for damages during the first mobilization. There was no written complaint to Bechtel about working conditions until March 17, 1978, despite the fact that Bagwell began fireproofing in July 1977. Further, in Bagwell's first formal submission for a claim, the conditions under which Bagwell was working were stated by it to be "within the required specifications." Luis Gonzalez, Bagwell's president, stated that this claim did not pertain to and thus was not relevant to the first mobilization, and that even though the above claim took place ten months after the termination of the first mobilization, only subsequently did Bagwell realize that it had a claim for compensation because of incurred losses. Nevertheless, this evidence still tends to establish that the changed conditions were not serious or regarded as such by Bagwell, because the "damage" was neither apparent nor reported for a long period of time. Unlike the second mobilization, there was no claim filed for additional compensation in anything resembling a timely manner. Additionally, Mr. Mohl of Bechtel testified that the obstructions in the first mobilization were isolated.

■ We also note that Bagwell's newfounded reliance on the lack of work releases as a cause of damages in the first mobilization could be viewed by the district court as not credible, especially in light of the long delay in presenting that claim. We note that the district court had the facts about the work releases before it, and there is no indication from the record that the district court refused to consider this evidence in its denial of damages for the first mobilization.

We hold that the district court's factual finding that damages are not owed by Middle South for Bechtel's actions during the first mobilization is not clearly erroneous.

### Conclusion

We determine that neither the appeal of Middle South nor the cross-appeal of Bag-

---

21. We observe that Middle South's position throughout has been that Bechtel breached no duty to it, even assuming it were to be liable to Bagwell.

well presents any ground meriting reversal. The judgment below is therefore in all things affirmed.

AFFIRMED.